**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

———————————————————————

JAMES A. REPPERT,

                                        Plaintiff,                        1:19-cv-01518 (BKS/CFH)

v.

NEW YORK STATE DEPARTMENT OF STATE,

                                        Defendant.

———————————————————————

**Appearances:**

*Plaintiff pro se:*
James A. Reppert
Albany, NY 12208

*For Defendants:*
Letitia James
Attorney General of the State of New York
Andrew W. Koster
Assistant Attorney General, of Counsel
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.   INTRODUCTION

Plaintiff pro se James Reppert brings this action against Defendant New York

Department of State ("DOS"), alleging that Defendant discriminated against him based on race,

subjected him to a hostile work environment based on race, and retaliated against him in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§

2000e to 2000e-17. (Dkt. No. 22). Presently before the Court is Defendant's motion to dismiss

the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 24). Plaintiff

opposes Defendant's motion. (Dkt. No. 30). For the following reasons, Defendant's motion is granted in part and denied in part.

## II.   PROCEDURAL HISTORY

In a Memorandum-Decision and Order entered on July 28, 2020, the Court dismissed Plaintiff's discrimination claim because the original Complaint contained conclusory allegations of racial animus and did not allege any facts that suggested Plaintiff's employer was motivated by discriminatory intent when it allegedly failed to promote Plaintiff or subjected him to a hostile work environment. *Reppert v. New York State Dep't of State*, No. 19-cv-1518, 2020 WL 4346932, at *5 & n.10, 2020 U.S. Dist. LEXIS 133303, at *12–13 & n.10 (N.D.N.Y. July 28, 2020). The Court also dismissed Plaintiff's retaliation claim because the original Complaint failed to adequately allege that Plaintiff had engaged in protected activity under Title VII. *Id.* at *5–6, 2020 U.S. Dist. LEXIS 133303, at *13–16. Recognizing that Plaintiff is a pro se litigant, and that with better pleading he might be able to cure the deficiencies the Court identified, the Court granted Plaintiff leave to file an amended complaint. *Id.* at *7, 2020 U.S. Dist. LEXIS 133303, at *16–17.

On September 30, 2020, Plaintiff filed an Amended Complaint. (Dkt. No. 22). In its motion to dismiss, Defendant argues that the Amended Complaint must be dismissed for failure to comply with the Court's Order because it contains many of the same conclusory facts that led to dismissal of the original Complaint. (Dkt. No. 24-1, at 5–6). Indeed, the Amended Complaint contains many of the original allegations and alleges few, if any, additional facts. However, Plaintiff attached more than three hundred pages of exhibits to the Amended Complaint. (*See generally* Dkt. No. 22-1). Reading these exhibits liberally, as it must in light of Plaintiff's pro se status, the Court has gleaned a number of additional facts, which are set forth in the next Section. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (explaining that "[d]ocuments that are

attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered" in ruling on a motion under Rule 12(b)(6)). Accordingly, to the extent Defendant seeks dismissal on the ground that the Amended Complaint fails to comply with the Court's Order, its motion is denied.

## III.    FACTS[1]

Plaintiff James Reppert is a Black, African-American, male. (Dkt. No. 22, at 1). Plaintiff, who has a master's degree in landscape architecture, is a professional urban planner and has been employed by the DOS as a Coastal Resource Specialist ("CRS") since 2001. (*Id.*). Plaintiff works in the Local Waterfront Revitalization Program ("LWRP"), which falls within the Planning Division of the DOS's Office of Planning, Development and Community Infrastructure ("OPD&CI"). (*Id.*; Dkt. No. 22-1, at 231). In 2013, Plaintiff was promoted from CRS 1 to CRS 2 but has, since then, been "passed up for promotional opportunities." (Dkt. No. 22, at 2, 6–7).

### A.    2015 Failure to Promote

In January 2015, the DOS posted an opening for a "Revitalization Specialist 2, Grade 27." (Dkt. No. 22-1, at 34). Plaintiff, and four others, including Sarah Crowell, were interviewed for the position by Stephen Ridler, who was Plaintiff's supervisor, and two others. (*Id.* at 2, 30). In April 2015, Sarah Crowell was hired for the position. (*Id.* at 29).

### B.    2016–2017 Complaints of Racial Discrimination

In or about January 2016, Plaintiff reported to the DOS's Division of Affirmative Action Programs ("DAA") that Stephen Ridler, the "Coastal Program Assistant Manager," and

---

[1] The facts are taken from the Amended Complaint its attached exhibits. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). The Amended Complaint recounts a number of events dating back to 2005 reflecting Plaintiff's efforts to obtain a reasonable accommodation for his disability, but as Plaintiff states that the conduct relevant to his racial discrimination and retaliation claims began in 2015, (Dkt. No. 30, at 1), and the allegations prior to 2015 appear to be relevant only to disability discrimination--a claim the Amended Complaint does not allege—the Court does not recite those facts here.

Plaintiff's "second level supervisor," was discriminating against him based on his race and color. (Dkt. No. 22-1, at 2). The DAA "filed" a complaint[2] on Plaintiff's behalf alleging that Plaintiff "experienced discrimination based on race/color by Stephen Ridler." (*Id.*). In letter dated January 12, 2016, Maria Herman, the Director of the DAA notified Plaintiff that the DAA had completed its investigation into the complaint and had concluded that "Mr. Ridler's actions violated the DOS Affirmative Action Policy Statement, and therefore, the allegations were substantiated." (*Id.*). Director Herman "advised that administrative action has been recommended to address the issues raised in the complaint" and instructed Plaintiff that if he experienced "any retaliation for having filed this complaint [Plaintiff] should report such immediately to" her. (*Id.*). Ridler was suspended "pending resolution of disciplinary action," which, as outlined below, took place in May and June 2017. (*Id.* at 320).

On June 28 and 29, 2016, Plaintiff emailed Director Herman about the racial discrimination and harassment Plaintiff contended he was experiencing at work. (Dkt. No. 22-1, at 307–13). Plaintiff told Director Herman he was having an "extraordinarily difficult summer" and sought advice "about what [he] should do to protect [himself]." (*Id.* at 311). He explained that he had "very recently" learned from "longtime trusted confidants" in the office that, when he was promoted to the CRS 2 position in 2013, he had not initially been on the "list of successful candidates" for the open positions.[3] (Dkt. No. 22, at 5–6; Dkt. No. 22-1, at 311–12). Plaintiff stated he had also learned that when Teneka Frost, the former DAA Director, reviewed the list, Frost "objected" to it and said "given all else being . . . equivalent, the position had to be offered to the minority candidate," after which, Plaintiff "got the position." (Dkt. No. 22-1, at 311).

---

[2] There is no indication where the "complaint" was "filed," *i.e.*, internally or with an outside agency.

[3] By contrast, the Amended Complaint states that Plaintiff learned in *January 2013* that he received the promotion based on his "protected class status." (Dkt. No. 22, at 6).

Plaintiff told Director Herman that not only was he "shocked to hear this story," but that his "shock soon turned to horror" when he learned that "this was common knowledge [and] that everyone in the office knew." (*Id.*).

An arbitration was scheduled for May 17, 2017 to "determine outcomes" for Ridler's alleged racial discrimination against Plaintiff. (Dkt. No. 22-1, at 320). In March 2017, the DOS counsel's office was preparing Plaintiff as a "key witness" for the arbitration, but the arbitration was cancelled after Ridler withdrew his "objection." (*Id.*). On or about June 24, 2017, Ridler "was separated from the agency," leaving his position vacant. (*Id.* at 211, 216).

At some point in 2017, Plaintiff complained to the DAA that the Deputy Secretary of State Sandi Allen, who oversaw the OPD&CI, had retaliated against him. (Dkt. No. 22, at 3; Dkt. No. 22-1, at 231; Dkt. No. 30, at 2). Deputy Secretary of State Allen resigned during the DAA's investigation of Plaintiff's complaint.[4] (Dkt. No. 22, at 3).

### C.     2017 Failure to Promote

By "early to mid-2017," following the resignations of Ridler and the Deputy Secretary of State, the "OPD&CI" was without leadership. (Dkt. No. 22, at 3). On June 20, 2017, Plaintiff met with "officials in the Department of State's Executive Office," including Brendan Fitzgerald, "to discuss his qualifications and how he could be of service to the Department." (*Id.*). Plaintiff indicated that he was interested in the positions of Deputy Secretary of State, program manager, Director of OPD&CI, or Planning Division program director.[5] (*Id.* at 7; Dkt. No. 22-1, at 9). The

---

[4] Plaintiff provided no details regarding the Deputy Secretary of State's alleged retaliation or the complaint he filed with the AAO.

[5] There appears to be more than one title for the same position along with corresponding codes and levels. To further complicate any effort to sort the hierarchy and ascertain what positions are available or filled, in some instances it appears that when an employee leaves a position, the duties from one position are assigned to another and the position is left vacant. (*See, e.g.,* Dkt. No. 22-1, at 2, 211 (referring to Ridler as both "Coastal Program Assistant Manager" and director of planning); *id.* at 213 ("The CRS 4 position is a key managerial position has been vacant due; in part; to a lack of qualified staff able to be promoted to the G-27 level. Leadership of the LWRP function falls to Stephanie Wojtowicz the existing CRS 3 in the Unit. Prior to Stephanie's promotion, all CRS 2, G-23, staff reported directly to

Deputy Secretary of State position was announced August 10, 2017, and in September 2017, the DOS named Kisha Santiago to the position. (Dkt. No. 22, at 3, 7). As Plaintiff continued to seek promotional opportunities, including the position of LWRP Program Manager, Fitzgerald advised Plaintiff to discuss promotional opportunities with Santiago; Plaintiff was unable to schedule a meeting with Santiago until December 2017. (*Id.* at 7; Dkt. No. 22-1, at 14, 17).

During the December 2017 meeting, Santiago was "antagonistic" toward Plaintiff, often questioning the meanings of Plaintiff's statements. (Dkt. No. 22, at 7). For example, Santiago pressed Plaintiff "for further meanings when" he stated that he was Santiago's "senior planner." (*Id.* at 7–8). Plaintiff "felt harassed" by Santiago's "aggressive tact as the meeting continued with a barrage of 'What does that mean' questioning." (*Id.* at 8). Further, Plaintiff, who had brought his resume to the meeting, "did not get a chance to discuss" either his credentials or the Program Manager position he was seeking. (*Id.* ). Plaintiff described the December 2017 meeting with Santiago as "hostile." (Dkt. No. 22-1, at 17). In 2018, Sarah Crowell was promoted to the position of "M4," "Coastal Program Manager."[6] (Dkt. No. 22, at 4; Dkt. No. 22-1, at 93). Eventually, she became Director of OPD&CI, which is directly below Santiago. (Dkt. No. 22-1, at 231).

**D.    2018 Failure to Promote**

On August 14, 2018, there was a celebratory "coffee and sweets event" attended by "all available" OPD&CI staff, including Plaintiff. (Dkt. No. 22, at 14). At the event, it was announced that Stephanie Wojtowicz was being promoted to a CRS 3 position. (*Id.* at 4, 14).

---

the Coastal Program manager, M-4, position."). For purposes of this motion, the Court need not attempt to sort or match titles or duties; rather, it simply uses the titles as used in the exhibits and interprets the submissions to raise the strongest claims they suggest.

[6] The exhibits attached to the Amended Complaint indicate that Crowell was promoted to "M4" in July or August *2017*. (Dkt. No. 22-1, at 91–93). It appears there were three candidates, in total, for this position; Plaintiff is not listed as a candidate. (*Id.* at 91).

Plaintiff, Wojtowicz, and two others had applied for this promotion and been interviewed in June 2018 by Santiago and Crowell. (Dkt. No. 22-1, at 165). Plaintiff learned that he had not been selected for the promotion at the staff event, when Wojtowicz's selection was announced. (Dkt. No. 22, at 14). Plaintiff was shocked, humiliated, and disappointed by the public announcement of Wojtowicz's promotion and the implicit announcement that he had been rejected for the position. (*Id.*). Plaintiff asserts there were a number of instances during the hiring process for this position that suggested Santiago and Crowell had "predetermined" that Wojtowicz would receive the promotion,[7] and Plaintiff attributes this to "ongoing discriminatory attitudes." (*Id.* at 4).

**E.     2018 Racially Discriminatory and Retaliatory Acts[8]**

The Amended Complaint lists nine categories of alleged discriminatory or retaliatory conduct Plaintiff claims to have experienced at the DOS followed by specific examples. The conduct underlying the alleged "Career Blocking," "Bypassed for Promotion" and "Hostile Meeting with Kisha Santiago," categories concern Plaintiff's failure to promote allegations, which are outlined above. The Court has outlined the remaining six categories below.

**1.     "Taking Away Assignments"**

Plaintiff alleges that Santiago and Crowell took away at least three of his assignments and duties. First, Crowell reassigned Plaintiff's "high-profile" Watkins Glen LWRP project, which had received a $2 million grant, to another staff member—purportedly "to reduce the need for travel" since the other staff member was "already going to Watkins Glen." (Dkt. No. 22, at 8). Plaintiff, however, was also "already travelling to Watkins Glen" for another project and asserts

---

[7] Plaintiff alleges that as early as May 2018, Wojtowicz was leading staff even though she had not been promoted, and that this action had been "sanctioned by" Santiago and Crowell. (Dkt. No. 22, at 16–17).

[8] Unless otherwise noted, it appears that most of this alleged conduct occurred in 2018, (*see, e.g.,* Dkt. No. 22, at 10–11 (October 16, 2018 supervisor meeting, September 7, 2018 email, and May 9, 2018 email)), but in some places, the Amended Complaint cites the month and date, but not the year, or does not provide a date, (*see, e.g.,* Dkt. No. 22, at 12 (citing staff meeting on May 24)).

that this justification for reassigning work "is not used in other regions" of the state.[9] (*Id.* at 8–9). Second, Crowell took over control of a project to write new LWRP monitoring guidance—a project Plaintiff had agreed to supervise and which involved a staff member who reported to Plaintiff. (*Id.* at 9). Third, despite having been personally invited to attend an Oswego Canal Bicentennial event featuring a project on which Plaintiff had worked, Santiago "went by herself" and Plaintiff was "not allowed to attend." (*Id.* at 10).

### 2.   "Marginalization and Exclusion"

Plaintiff alleges that Santiago directed him to "work on staff performance measure narrative guidance and to manage [his] projects as a priority" rather than focusing on a community survey for an evolving LWRP project. (Dkt. No. 22, at 9–10). Plaintiff also cites his exclusion from the Oswego Bicentennial; Santiago and Crowell's exclusion of him from an Auburn assignment; a co-worker's "need to justify" her proposal to add Plaintiff to a review committee and the lack of response by Santiago and Crowell to her proposal of adding Plaintiff; and Santiago's assignment of a vetting role to Plaintiff, which uses "no professional planning skills" and has no "public-facing activities."  (*Id.* at 10–11).

### 3.   "Demeaning Comments in Meetings"

Plaintiff asserts that Santiago used "[d]emeaning comments in meetings." (Dkt. No. 22, at 11–12). First, she told Plaintiff to "put a pin in it" after he raised a topic about "Inland Waterways LWRP issues," which Plaintiff interpreted to mean that the topic he had raised was "a live hand grenade for which [Plaintiff] should replace the pin to avoid a dangerous detonation." (*Id.* at 11). Second, Santiago "flatly contradicted" Plaintiff's statement that there was a difference between two programs by saying that she saw "no difference between them."

---

[9] This assignment stemmed from a 2017 grant; the Amended Complaint does not indicate when Crowell reassigned this project. (Dkt. No. 22, at 8).

(*Id.*). Third, at a May 18, 2018 review committee meeting, Santiago and Crowell "repeatedly questioned" Plaintiff's observations and "put [him on the] defensive" in explaining his observations, creating a "tense situation" that a co-worker had to defuse. (*Id.* at 12).

### 4.    "Hostile Emails"

Crowell wrote a "negative email" to Plaintiff after he forwarded an email to staff with ideas for the agenda for an upcoming staff meeting, stating that they had "not had time to discuss these ideas prior to presenting them to staff." (Dkt. No. 22, at 12). Plaintiff asserts there has never been "pre-discussion of the idea content for meetings." (*Id.*).

On a separate occasion, Santiago "chastised" Plaintiff when he stated "that we dropped the ball on the Great Lakes region" and did not attempt to "find out why [Plaintiff] thought this."[10] (Dkt. No. 22, at 13).

### 5.    "Treated Differently than Peers"

At a supervisors' meeting on May 21, 2018, Santiago noted that the performance evaluations Plaintiff had completed were "well-written" and stated that as she was "assigning special projects to people to work on independently," she was going to assign Plaintiff "to develop a guidance for supervisors to write performance evaluations." (Dkt. No. 22, at 13). Santiago, however, did not assign any other "special projects" at this or any other meeting. (*Id.*). By assigning Plaintiff this project "aloud during a meeting of all supervisors," Santiago "singled out" Plaintiff "with a non-planning-profession task." (*Id.*). Plaintiff asserts that Santiago assigned this project to show "all supervisors that [Plaintiff was] only fit to assign simple tasks that have no import for the direction of the LWRP program and do not use professional planning credentials." (*Id.*).

---

[10] This is in Plaintiff's "Hostile emails" section but does not appear to have involved an email. (Dkt. No. 22, at 13). The Court considers this allegation to the extent it shows Plaintiff's supervisors' hostility towards him.

Plaintiff was not offered the "vacant window cubicle" despite his seniority, giving the "appearance of no confidence" in Plaintiff and communicating the message that "authority does not necessarily accrue with experience or seniority." (Dkt. No. 22, at 13).

Santiago put a staff meeting on hold after Plaintiff tried to propose content for the meeting. (Dkt. No. 22, at 14). Santiago then accepted Wojtowicz's proposed agenda for the staff meeting, even though the staff meeting was still on hold. (*Id.*).

Crowell sent a lead planner to observe two meetings where Plaintiff was the lead planner; "[n]o other lead planner had their meetings observed by another DRI lead planner." (Dkt. No. 22, at 14).

### 6.    "Undermining Authority"

After Plaintiff entered an event dated May 30, 2018 on a reporting spreadsheet "that flags information for" Santiago and the Secretary of State, Santiago emailed "the 16 most highly ranking staff, directing Plaintiff and two others to look at the event entry as she believed the date was "July 3rd." (Dkt. No. 22, at 15). Plaintiff asserts that Santiago's email communicates "no confidence messages" to office leadership. (*Id.*). Plaintiff also cites Santiago's assignment of the "special project" drafting guidance for writing performance evaluations as another example of Santiago's undermining of his authority. (*Id.*).

### F.    2018 Complaint of Discrimination and Retaliation

On August 30, 2018, Plaintiff sent a letter to the Secretary of State and Counsel to the Governor seeking assistance in remedying his "work situation at OPD&CI," as he was working "in an environment that is discriminatory and retaliatory" and "less than hospitable for [him], and other minorities." (Dkt. No. 22-1, at 17). Plaintiff wrote that Kisha Santiago and Sarah Crowell had "exclude[d him] and have taken away assignments, made demeaning comments in meetings, sent hostile e-mail, treated [him] differently than other staff, and more recently,

bypassed [him] for a promotion for someone who is significantly less experienced and less

qualified." (*Id.*). In a letter to Plaintiff (copied to DAA Director Herman) dated October 10,

2018, the Secretary of State responded that she had "asked the [Director of the DAA] . . . to

initiate an investigation of any new claims and reach out . . . to obtain any documentation or

other supporting information [Plaintiff could] provide to assist [the Director in] undertak[ing] a

thorough investigation of [Plaintiff's] complaints." (*Id.* at 18).

### G.    2019 Promotional Exam

On May 19, 2019, Plaintiff took a promotional exam for a CRS 3 position. (Dkt. No. 22-

1, at 219, 318). As of July 2019, Plaintiff was ranked third out of six candidates. (*Id.* at 318). As

of the September 30, 2020 Amended Complaint, Plaintiff alleges he continues to "serve as a

CRS [2]." (Dkt. No. 22, at 2).

### H.    EEOC Charge and Notice of Intent

Plaintiff has filed a charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC"), though it is unclear from the Amended Complaint when he did so. The

original Complaint indicated that he filed a claim on February 22, 2019. (Dkt. No. 1, at 4). The

Amended Complaint contains no allegations regarding filing date. However, attached to the

Amended Complaint are: correspondence dated March 15, 2019, between the DOS and the

EEOC concerning Plaintiff's charge, (Dkt. No. 22-1, at 322), and a letter dated July 29, 2019

from Plaintiff to the EEOC. (*Id.* at 316–20).[11]

On February 3, 2020, Plaintiff filed with the New York Attorney General a "notice of

intent to file a claim of tort" against DOS for "negligent exposure to racial [sic] discriminatory

acts." (Dkt. No. 22, at 7; Dkt. No. 22-1, at 233–34).

---

[11]  Defendant asserts that the EEOC charge was filed on March 4, 2019, citing to a letter extraneous to the complaint, from the EEOC to Defendant. (Dkt. No. 24-1, at 13–14; Dkt. No. 24-2).

## IV.   STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint that has been filed pro se "must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that it suggests." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). "Nonetheless, a pro se complaint must state a plausible claim for relief." *Id.*

## V.   DISCUSSION

### A.   Race Discrimination

Plaintiff alleges that Defendant has failed to promote him and subjected him to unequal terms and conditions of employment based on race. (Dkt. No. 22, at 5). Defendant moves to dismiss Plaintiff's race discrimination claim on the ground that the Amended Complaint "does not include sufficient facts supporting the inference that racial discrimination was a motivating factor behind the alleged conduct." (Dkt. No. 24-1, at 7). The Court agrees.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e–2(a)(1). A race discrimination claim under Title VII "is subject to the burden-shifting evidentiary framework set forth in *McDonnell Douglas*." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). As this motion is one to dismiss, however, the Court "focus[es] only on whether the allegations in the complaint give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a litigation." *Id*.

To defeat a motion to dismiss, "a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). The plaintiff may meet the burden of showing a motivating factor "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* A complaint is sufficient "if it pleads specific facts that support a minimal plausible inference of such discrimination." *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016). Stating a claim for unequal terms and conditions of employment generally requires some showing "that there were other similarly situated employees, outside the protected class, who engaged in conduct substantially similar to that of plaintiff but received preferential treatment." *Vanhorne v. N.Y.C. Transit Auth.*, 273 F. Supp. 2d 209, 216 (E.D.N.Y. 2003); *accord Smith v. St. Luke's Roosevelt Hosp.*, 2009 WL 2447754, at *22, 2009 U.S. Dist. LEXIS 69995, at *81–82  (S.D.N.Y. Aug. 11, 2009).

Here, Plaintiff alleges that he was passed over for promotion in 2015, 2017, and 2018, and has remained a CRS 2 since 2013. (Dkt. No. 22, at 4, 7). Defendant argues that Plaintiff's failure to promote claim is defective because he does not "state[] the dates on which his applications for those positions were denied or if he even applied for them at all." (Dkt. No. 24-

1, at 6). Defendant is correct that the Amended Complaint itself does not allege facts for each promotion Plaintiff was allegedly denied, but reading the Amended Complaint together with the attached exhibits, the Court finds there are sufficient facts to allow a plausible inference of failure to promote. As to the 2015 failure to promote claim, the exhibits attached to the Amended Complaint indicate that in January 2015, the DOS posted an opening for a "Revitalization Specialist 2," position, (Dkt. No. 22-1, at 34), for which Plaintiff and four others were interviewed, (*id.* at 1, 2, 30), and that in April 2015, the position was given to Crowell, not Plaintiff, (*id.* at 29). In 2017, after the OPD&CI had lost at least two employees in leadership positions, Plaintiff sought out officials in the DOS Executive Office to discuss his qualifications for those positions—others were promoted instead. (Dkt. No. 22, at 3–4, 7; Dkt. No. 22-1, at 9, 93). In 2018, Plaintiff was interviewed for, but did not receive, a promotion to CRS 3. (Dkt. No. 22, at 14; Dkt. No. 22-1, at 165).[12] The Court therefore has no difficulty finding Plaintiff has alleged adverse action in connection with his 2015, 2017 and 2018 failure to promote claims. *See Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) (observing that failure to promote is an adverse action). Accordingly, the Court must consider whether the Amended Complaint alleges that race was a motivating factor in Defendant's failure to promote him.

To the extent Plaintiff asserts an unequal terms and conditions theory of discrimination, he has alleged no facts showing "that there were other similarly situated employees, outside the protected class, who engaged in conduct substantially similar to that of plaintiff but received preferential treatment." *Vanhorne*, 273 F. Supp. 2d at 216. In the Amended Complaint, Plaintiff identifies a number of individuals who were promoted, while he was left behind as a CRS 2,

---

[12] Plaintiff did not identify a promotion he was denied in 2019, following his written promotional test for a CRS 3 position. To the extent Plaintiff claims Defendant failed to promote him in 2020, (Dkt. No. 22, at 4), he has alleged no facts in support of such claim.

(Dkt. No. 22, at 3–4 (Kisha Santiago, Stephanie Wojtowicz, Sarah Crowell, Amy DeGaetano)),

but makes no allegations that these individuals were outside Plaintiff's protected class. *Cf.*

*Hernandez v. City of New York*, No. 11-cv-3521, 2013 WL 593450, at *5, 2013 U.S. Dist.

LEXIS 31793, at *13 (E.D.N.Y. Feb. 13, 2013) (dismissing discrimination claim because

"Plaintiff has alleged . . . that the Defendants treated similarly-situated non-Hispanic individuals

more favorably than they treated Plaintiff" but "Plaintiff provides examples with little details

about . . . the comparators").

Nor are there any allegations that would support a plausible inference of racially

discriminatory intent in the denial of the 2015, 2017 or 2018 promotions. Plaintiff alleges that

there were "favored candidates" whose promotions were "pre-determined," (Dkt. No. 22, at 4),

but no facts that would allow an inference that these candidates were favored on account of race.

For example, Plaintiff alleges that he was "disadvantaged due to pre-determined promotional

position interview outcomes that . . . appear to arise from . . . discriminatory attitudes at the

Department of State," (Dkt. No. 22, at 4), but this allegation is conclusory and lacks supporting

facts that would allow an inference of discrimination. *See Iqbal*, 556 U.S. at 663 ("[T]he tenet

that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of

a cause of action's elements, supported by mere conclusory statements."); *see also Williams v.*

*Classic Sec.*, No. 18-cv-1691, 2019 WL 4511953, at *4, 2019 U.S. Dist. LEXIS 160217, at *11

(S.D.N.Y. Sept. 19, 2019) (dismissing Title VII race discrimination claim, explaining that

because the plaintiff's allegation that he "was subject to adverse actions" by the defendants

"under race . . . [discrimination]" and that "other similarly [situated] employees of other

races . . . [were] not reprimanded" was conclusory and lacked "any supporting facts," it did not

"permit the inference that racial discrimination motivated or contributed to his firing" ) (internal

citations omitted). The Amended Complaint contains a number of similarly conclusory allegations without supporting facts. (*See* Dkt. No. 22, at 6 (alleging exposure to "racial discriminatory acts"), 7 (alleging "disadvantaged due to racist discriminatory attitudes"), 8 (alleging retaliation that "is carrying on the legacy that begun as racist treatment")).[13]

Moreover, without facts tying their conduct to Plaintiff's race, even indirectly, neither Santiago's hostility toward him and sharp questioning during meetings, Crowell's reassignment of tasks, nor their exclusion of him from "issues or opportunities," allow a plausible inference that racial discrimination motivated the denial of promotions to Plaintiff. Conclusory allegations of "racist behavior," without any supporting facts, are not sufficient; the pleaded facts must "provide 'at least minimal support for the proposition that [Plaintiff's] employer was motivated by discriminatory intent.'" *Williams*, 2019 WL 4511953, at *5, 2019 U.S. Dist. LEXIS 160217, at *10–11 (S.D.N.Y. Sept. 19, 2019) (quoting *Littlejohn*, 795 F.3d at 311). Accordingly, Defendant's motion to dismiss Plaintiff's race discrimination claim is granted.

### B.    Hostile Work Environment

Plaintiff alleges Defendant subjected him to a hostile work environment based on race. (Dkt. No. 22, at 7). Defendant argues that Plaintiff's hostile work environment claim is subject to dismissal for the same reason as his race discrimination claim: the Amended Complaint fails to allege facts supporting an inference of race-based conduct. (Dkt. No. 24-1, at 7). The Court agrees.

---

[13] The closest Plaintiff comes to alleging race as a motivating factor is with respect to his 2015 failure to promote claim—but his allegations fall short. Plaintiff alleges that was denied promotion in 2015, following an interview by, among others, Ridler, who, in 2016, was found by the DAA to have subjected Plaintiff to racial discrimination. Without any factual detail, however, regarding Ridler's conduct or when it occurred, the Court has no basis from which to infer race discrimination was a factor in denying Plaintiff promotion in 2015.

"To establish a hostile work environment under Title VII . . . a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn*, 795 F.3d at 320–21 ((quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The incidents Plaintiff alleges in support of his hostile work environment claim—Santiago's hostility toward him and sharp questioning, Santiago and Crowell's removal of certain assignments, Santiago's refusal to allow him to attend an event he had been invited to personally, Santiago's direction to "put a pin in it" and "flat contradiction" of Plaintiff's statements in meetings, and correction of Plaintiff's work in an email copied to office leadership, among others—are generally mild in nature, episodic, and insufficient to allow a plausible inference of severe or pervasive working conditions. *See Gong v. City Univ. of New York*, 846 F. App'x 6, 7 (2d Cir. 2021) (affirming dismissal of race and national origin hostile work environment claim where the plaintiff alleged the defendant delayed promotions, assigned her to teach courses on East Asian and Chinese geography, assigned her (but not Caucasian professors) evening office hours, replaced her with a Caucasian adjunct professor on a search committee, and organized a faculty meeting with presentations criticizing actions by China, because the alleged incidents were "too mild and 'episodic' to support her claim." (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)). And even assuming they allege an abusive working environment, as discussed above, there are no facts alleged in connection with any incident that contain or suggest a racial overtone. *Gong*, 846 F. App'x at 9 (affirming dismissal of hostile work environment claim at motion to dismiss stage where "many of the alleged incidents lack any racial overtone"). Accordingly, the Court concludes that Plaintiff's hostile work environment claim fails and Defendant's motion to dismiss is granted.

### C.     Retaliation

Plaintiff alleges that Defendant retaliated against him for complaining about race discrimination by failing to promote him and treating him differently in the workplace. (Dkt. No. 22, at 7). Defendant argues that Plaintiff's retaliation claim must be dismissed because Plaintiff fails to allege a causal connection between his purported protected activity and the alleged adverse actions. (Dkt. No. 24-1, at 10).

Title VII states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). "Thus, for a Title VII retaliation claim to survive a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90.

Generally, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). To determine "whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines,* 593 F.3d 159, 165 (2d Cir. 2010).

### 1.     Protected Activity

Title VII's "protected activity" provision "includes 'both an opposition clause and a participation clause.'" *Littlejohn*, 795 F.3d at 316 (quoting *Townsend v. Benjamin Enters., Inc.*,

679 F.3d 41, 48 (2d Cir. 2012)). "The opposition clause makes it unlawful for an employer to retaliate against an individual because she 'opposed any practice' made unlawful by Title VII." *Id.* (quoting *Townsend*, 679 F.3d at 48). "[T]he participation clause makes it unlawful to retaliate against an individual because she 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' Title VII." *Id.* (quoting *Townsend*, 679 F.3d at 48).

From the Amended Complaint and its attached exhibits, the Court identifies the following alleged protected activities: in January 2016, Plaintiff complained to the DOS's Division of Affirmative Action that his supervisor, Stephen Ridler was subjecting him to racial discrimination,[14] (Dkt. No. 22-1, at 2); in June 2016, Plaintiff emailed DAA Director Herman that he had believed he had experienced race discrimination in connection with the disclosure of the manner in which he had been promoted, (*id.* at 307–13); in March 2017, Plaintiff was working with the DOS as a "key witness" in preparation for the arbitration to determine Ridler's "outcome[]" in connection with Plaintiff's charges of race discrimination, (*id.* at 320); on August 30, 2018, Plaintiff sent a letter to the Secretary of State, notifying her that Plaintiff continued to work in a "discriminatory and retaliatory" environment where the environment was "less that hospitable for [Plaintiff] and other minorities," (*id.* at 17); and in early 2019, Plaintiff filed a complaint with the EEOC alleging discrimination and retaliation, (Dkt. No. 1, at 4).[15] The Court

---

[14] The Court found the original Complaint failed to allege Plaintiff's participation in the Ridler arbitration was "protected activity" because there were no facts from which to infer that the arbitration was connected to Plaintiff's January 2016 complaint of discrimination against Ridler. Although the Amended Complaint asserts few additional facts, the attached exhibits allow a plausible inference that Plaintiff's participation in the Ridler arbitration was in continuance of his complaint of (and opposition to) discrimination and retaliation by Ridler. (*See, e.g.*, Dkt. No. 22-1, at 233 ("These acts [of negligent exposure to racial discrimination] are ongoing, beginning with by my supervisor Stephen Rider, through preparation for a scheduled arbitration hearing May 23, 2017.")).

[15] The Amended Complaint alleges two other protected activities: on July 29, 2019, Plaintiff sent a letter to an EEOC investigator in furtherance of his complaint detailing the discrimination and retaliation he had experienced, (Dkt. No. 22-1, at 316–20); and on February 10, 2020, Plaintiff sent a letter to the New York State Attorney General alleging

considers whether the Amended Complaint and exhibits give rise to a plausible inference that the alleged adverse actions were motivated by this protected activity.[16]

### 2.      Causal Connection[17]

"To adequately plead causation, 'the plaintiff must plausibly allege that the retaliation was a "but-for" cause of the employer's adverse action." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (quoting *Vega*, 801 F.3d at 90). However, "'[b]ut-for' causation does not . . . require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (quoting *Vega*, 801 F.3d at 91).

### a.      September 2017 Failure to Promote

In or about June 2017, Plaintiff sought a promotion to a leadership position, including the position of Deputy Secretary of State, within OPD&CI. The position of Deputy Secretary of State was announced on August 10, 2017, and in September 2017, the DOS named Santiago to the position. (Dkt. No. 22, at 3, 7).[18] The September 2017 promotion denial occurred within at least six months of Plaintiff's continuing efforts to oppose the racial discrimination to which Ridler had subjected him: Plaintiff alleges that he was working with DOS counsel's office

---

"negligent exposure to racial discriminatory acts," (*id.* at 233). As there are no identifiable adverse actions after either of these activities, the Court does not consider them further.

[16] Defendant does not argue, in its present motion, that these complaints do not qualify as "protected activity" within the meaning of Title VII.

[17] The Court finds no basis on which to consider the denial of the Revitalization Specialist 2 position in April 2015, (*id.* at 2, 29–30, 34), as Plaintiff alleges no relevant protected activity.

[18] Although, as Defendant notes, Plaintiff does not allege that he formally "applied" for a leadership position, (Dkt. No. 24-1, at 6), construing Plaintiff's pro se Amended Complaint and attached exhibits liberally, given the allegations that in or about 2017, Deputy Secretary of State Allen had resigned, (Dkt. No. 22, at 3); in June 2017, Plaintiff indicated that he was interested in, among other leadership positions, the Deputy Secretary of State position, (Dkt. No. 22, at 7; Dkt. No. 22-1, at 9); and in September 2017, the DOS named Santiago as the Deputy Secretary of State, (Dkt. No. 22, at 3), the Court concludes it is plausible to infer that there was an opening for Deputy Secretary of State and that Plaintiff sought and was denied the Deputy Secretary of State position.

around March 30, 2017, to prepare as "key witness" for the arbitration hearing that was not cancelled until May 2017. (Dkt. No. 22-1, at 320; Dkt. No. 22, ¶ 7). In light of this, and the fact that at least one of the leadership positions was open in consequence of Plaintiff's efforts to oppose Ridler's conduct, Plaintiff has sufficiently alleged a causal connection between the denial of the promotion in September 2017 and his protected activity. *See Vega*, 801 F.3d at 90 ("A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action."); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship."). Accordingly, Defendant's motion to dismiss is denied as to Plaintiff's September 2017 retaliatory failure to promote claim.

### b.      August 9, 2018 Failure to Promote

Plaintiff alleges that he applied and was interviewed for a CRS 3 promotion in June 2018, and that Defendant denied the promotion on August 9, 2018. (Dkt. No. 22, at 4, 14; Dkt. No. 22-1, at 165). At the time of Defendant's failure to promote Plaintiff, approximately seventeen months had passed since his last protected activity—his March 2017 work with the DOS in preparing to testify against Ridler, who had discriminated against him. Thus, temporal proximity alone does not provide a basis for inferring causation. *See, e.g., Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) ("Action taken . . . 20 months later suggests, by itself, no causality at all."). This does not end the inquiry, however, because "an inference of causation" may be "drawn when one considers the facts as a whole." *Duplan*, 888 F.3d at 626. The Second Circuit has recognized that "proof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment." *Id.* (quoting *Grant v. Bethlehem*

*Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980); and citing *Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10-cv-5612, 2012 WL 3646935, at \*14, 2012 U.S. Dist. LEXIS 120144, at \*44 (E.D.N.Y. Aug. 22, 2012) (observing that a "pattern of antagonism" over the intervening period may be sufficient to demonstrate the requisite causal connection)).

Plaintiff alleges that Santiago's initial dismissive and antagonistic behavior toward him began in November and December 2017, and was in response to Plaintiff's continued pursuit of a promotion to OPD&CI leadership—after having been denied a position in September 2017. Plaintiff further alleges that in May 2018, Santiago and Crowell, and others in his workplace subjected him to minor acts of retaliation, including seeking justification for adding Plaintiff to a review committee, subjecting him to repeated questioning and objections during meetings, sending Plaintiff "negative email" criticizing Plaintiff's actions, correcting him in an email sent to highly-ranked staff, and singling Plaintiff out at a meeting with other supervisors by assigning him a simple, "non-planning profession task." (Dkt. No. 22, at 11–15). The interview for the CRS 3 promotion was in June 2018, and, according to Plaintiff, though he did not learn until August 9, 2018, that his application for promotion was denied, Santiago and Crowell had allowed Wojtowicz, who received the promotion, to lead the LWRP unit before the promotion announcement. (*Id.* at 16). These allegations suggest only mildly adverse actions, but the Court considers them "in the aggregate, 'as even minor acts of retaliation can be sufficiently substantial in gross.'" *United States v. New York City Dep't of Educ.*, 407 F. Supp. 3d 365, 408 (S.D.N.Y. 2018) (quoting *Hicks*, 593 F.3d at 165).

Here, viewed as a whole, the allegedly adverse actions—beginning in September 2017, when Plaintiff was first denied a leadership promotion, followed by Santiago's dismissive treatment of Plaintiff in November and December 2017 when he attempted to continue seeking a

leadership promotion, and the denial of the CRS 3 promotion in August 2018—plausibly suggest that Defendant engaged in a pattern of hinderance toward Plaintiff's effort to obtain promotion, and thus allow a plausible inference of causation. *See Duplan*, 888 F.3d at 626 (concluding "an inference of causation is more easily drawn when one considers the facts as a whole," and finding that allegations that, following the plaintiff's 2011 complaints and continuing through 2014, "his supervisors collectively and persistently discouraged him from remaining at the Department by ostracizing him, giving him insufficient work, and making clear to him that his career would not advance further by denying him every promotion and raise," "establish[ed] a drumbeat of retaliatory animus from which a plausible inference of causation can be drawn"); *Chan v. NYU Downtown Hosp.*, No. 03-cv-3003, 2004 WL 213024, at *3, 2004 U.S. Dist. LEXIS 1419, at *9 (S.D.N.Y. Feb. 3, 2004) ("Even though an alleged act of retaliation may be separated by a significant gap in time from the date on which a complaint of discrimination was made, evidence of an intervening pattern of antagonism between the complaint and her employer could support an inference that an alleged retaliatory act that was taken against the complainant was causally related to her complaint of discrimination."). Accordingly, Defendant's motion to dismiss Plaintiff's August 2018 failure to promote claim is denied.[19]

### D.     Statute of Limitations

Defendant argues that because Plaintiff filed his EEOC charge of discrimination on March 4, 2019, all claims occurring prior to May 8, 2018, are barred by Title VII's 300-day

---

[19] Plaintiff took a CRS 3 promotional exam on May 11, 2019, (Dkt. No. 22-1, at 219, 318), but has not, to date, been promoted. There is, however, no allegation that Plaintiff applied for a promotion in connection with that exam. Plaintiff also alleges that there were "meetings" in November 2019 and March 2020 where promotions were "pre-determined, with the intent of promoting favored candidates and the effect of not promoting the Plaintiff." (Dkt. No. 22, at 4; Dkt. No. 22-1, at 208). But as there are no allegations regarding whether promotions resulted from these meetings, or that Plaintiff sought these positions, the Court has not considered these allegations as adverse actions. (Dkt. No. 22-1, at 219).

statute of limitations. (Dkt. No. 24-1, at 13–14). In support of its argument, Defendant relies on an exhibit it attached to its motion to dismiss. (Dkt. No. 24-2) (letter dated March 4, 2019, from EEOC to DOS regarding Plaintiff's charge of discrimination).

"As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (quoting *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)); *see also* 42 U.S.C. § 2000e–5(e) and (f). "Title VII requires that individuals aggrieved by acts of discrimination [in states like New York] file a charge with the EEOC within . . . 300 days 'after the alleged unlawful employment practice occurred.'" *Vega*, 801 F.3d at 78–79 (quoting 42 U.S.C. § 2000e–5(e)(1)). Failing to timely file a charge "acts as a bar to a plaintiff's ability to bring the action." *Semper v. N. Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 576 (E.D.N.Y. 2011) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)).

Because Defendant's motion relies on a document outside the Amended Complaint and its attached exhibits, the Court must first determine whether it may consider the document. Generally, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court may not consider material extraneous to the complaint unless it is "attached to the complaint as an exhibit or incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). Here, nothing suggests Plaintiff relied on the March 4, 2019 EEOC letter in drafting the Amended Complaint and the Amended Complaint does not incorporate the letter by reference.

Thus, the letter is not integral to the Amended Complaint. Accordingly, the Court must either exclude the letter and decide the motion based solely upon the Amended Complaint or convert the motion to one for summary judgment under Federal Rule of Civil Procedure 56. *See Friedl v. City of N.Y.*, 210 F.3d 79, 83 (2d Cir. 2000); Fed. R. Civ. P. 12(d). As there has been no discovery on this issue and Plaintiff is proceeding pro se, the Court declines to convert this motion to one for summary judgment, excludes the EEOC letter, and decides the motion based on the Amended Complaint.[20] *See Palomo v. Demaio*, No. 15-cv-1536, 2017 WL 401240, at *5, 2017 U.S. Dist. LEXIS 11963, at *11–13 (N.D.N.Y. Jan. 30, 2017) (refusing to consider evidence submitted on motion to dismiss in support of statute of limitations argument and declining to convert motion to one for summary judgment).

The Amended Complaint does not identify a filing date, and while the attached exhibits reflect two dates of communication between the parties and the EEOC, (Dkt. No. 22-1, at 316, 322), they do not reflect a filing date, either. Accordingly, the Court cannot decide Defendant's statute of limitations defense from the face of the Amended Complaint.[21] *Cf. Connecticut Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) ("Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)). Of course, the Court may reevaluate the timeliness of Plaintiff's claims at a later stage.

[20] The Court also declines to take "judicial notice of the fact that [the EEOC complaint] was filed on March 4, 2020." (Dkt. No. 24-1, at 10 n.4). Even if judicial notice were appropriate, the letter is a request by the EEOC to Defendant for information and does not contain a filing date or reflect what was filed.

[21] The original Complaint alleged that Plaintiff filed charges with the New York State Division on Human Rights, the New York City Commission on Human Rights or EEOC on February 22, 2019. (Dkt. No. 1). As neither party addressed this, given Plaintiff's pro se status, the Court declines to utilize this date in a statute of limitations determination at this stage.

VI.     **CONCLUSION**

For these reasons, it is

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 24) is **GRANTED** as to Plaintiff's Title VII race discrimination and hostile work environment claims; and it is further

**ORDERED** that Plaintiff's Title VII race discrimination and hostile work environment claims are **DISMISSED with prejudice**;[22] and it is further

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 24) is otherwise **DENIED**; and it is further

**ORDERED** that the Clerk of the Court is directed to serve this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:   July 26, 2021
         Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

[22] Plaintiff has now filed two complaints along with more than three hundred pages of exhibits. The Court has considered these pleadings and exhibits with deference to Plaintiff's status as a pro se litigant but has concluded that further amendment as to any race discrimination claim would be futile. Indeed, Plaintiff has not requested further amendment. Accordingly, the Court dismisses these claims with prejudice.