**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JAMES A. REPPERT,

                                        Plaintiff,                                1:19-cv-01518 (BKS/CFH)

v.

NEW YORK STATE DEPARTMENT OF STATE,

                                        Defendant.

---

**Appearances:**

*Plaintiff Pro Se:*
James A. Reppert
488 Western Avenue
Albany, New York 12203

*For Defendant:*
Letitia James
Attorney General
State of New York
Mark J. Dolan
Assistant Attorney General, of Counsel
The Capitol
Albany, New York 12224-0341

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

        Plaintiff pro se James A. Reppert brings this action alleging that his employer, Defendant

New York State Department of State ("DOS") failed to promote him in retaliation for

complaining about racial discrimination, in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), *as amended*, 42 U.S.C. § 2000e *et seq.* (*See generally* Dkt. No. 22). Presently

before the Court are Defendant's motion for summary judgment under Federal Rule of Civil

Procedure 56, (Dkt. No. 80), and Plaintiff's motion for additional discovery, (Dkt. No. 90). The motions are fully briefed. (Dkt. No. 84, 91). For the reasons that follow, Defendant's motion is granted and Plaintiff's motion is denied.

## II.   FACTS[1]

### A.   The Parties

The DOS is an "executive agency of the State of New York," (Dkt. No. 80-9, ¶ 2), which is "charged with," as relevant here, promoting the "use and protection of coastal waterways; preservation, protection, enhancement and restoration . . . of the State's coastal area; partnership with waterfront communities . . . to address local and regional (coastal and inland) waterway issues; improvement of water quality and natural area; . . . promot[ing] . . . public waterfront access; and providing for redevelopment of underutilized waterfronts," (Dkt. No. 80-4, ¶ 4). The DOS "contains the Office of Planning, Development & Community Infrastructure ('OPDCI')," (Dkt. No. 80-9, ¶ 2), which is "responsible for the Local Waterfront Revitalization Program ('LWRP')"—a "comprehensive land and water use program," (Dkt. No. 80-2, at 27), and "the State's primary program for working in partnership with waterfront communities across the State," (Dkt. No. 80-4, ¶ 5).

Deputy Secretary of State Kisha Santiago-Martinez leads the OPDCI as the "executive manager for all functions of the office." (Dkt. No. 80-4, ¶ 5). Sarah Crowell is the Director of OPDCI, and is responsible for, among other things, directly overseeing the LWRP. (Dkt. No. 80-6. ¶ 4). The OPDCI is staffed by among others, employees in the "Coastal Resource Specialist" title series, which is comprised of, from lowest to highest: Coastal Resource Specialist 1 ("CRS

---

[1] The facts are drawn from Defendant's Statement of Material Facts Pursuant to Rule 56.1(a) and Plaintiff's Response, (Dkt. Nos. 80-9, 84-1), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

1"), Coastal Resource Specialist 2 ("CRS 2"), Coastal Resource Specialist 2 ("CRS 3), M-3, and M-4. (Dkt. No. 80-2, at 22).

Plaintiff James Reppert has a Bachelor of Arts degree and a Master's Degree in landscape architecture. (Dkt. No. 80-2, at 10). Plaintiff previously worked as the "senior planner" for Albany County. (*Id.* at 120–21). "Plaintiff began his employment with DOS in 2001 as a [CRS 1] for OPDCI working on projects for the [LWRP]." (Dkt. No. 80-9, ¶ 3). From 2001 to 2008, Plaintiff worked on LWRPs, and the construction projects and programs necessary to "implement them." (*Id.* at 121). At the DOS, Plaintiff has also worked "as a special projects person creating performance measures for the LWRPs and doing reporting to our federal sponsors through [a] federal program," interfacing with the state, and as a "regulator enforcing policies of the LWRP." (*Id.* at 122). "In 2013, Plaintiff was promoted to [CRS 2], a position he continues to occupy today." [2] (Dkt. No. 80-9, ¶ 4).

### B.     Plaintiff's Complaints of Racial Discrimination and Retaliation

At some point prior to January 2016, Plaintiff's "second level supervisor," Stephen Ridler, the "Coastal Program Assistant Manager," (Dkt. No. 22-1, at 2), began to "harass[]" Plaintiff by "nitpicking" Plaintiff's work products, "attempting to intimidate" and issuing "unsatisfactory" performance reviews. (Dkt. No. 80-2, at 54). Feeling that Ridler's treatment was "unfair" and that he was "trying to drive" Plaintiff "out of the office," Plaintiff complained to the DOS's Division of Affirmative Action Programs. (*Id.* at 53, 55; Dkt. No. 22-1, at 2). In or about January 2016, the Division of Affirmative Action filed a complaint on Plaintiff's behalf  alleging that Ridler subjected Plaintiff to "discrimination based on race/color." (Dkt. No. 22-1, at 2). In a

---

[2] The "distinguishing characteristic between" a CRS 1 and a CRS 2 is that a CRS2 "is the first level supervisor" and "supervises the work of a" CRS 1. (Dkt. No. 80-2, at 22). As a CRS 2, one of Plaintiff's responsibilities is to train new CRS 1s "that didn't know anything about state service or the program," "assign[] them work and then supervise[] it." (*Id.* at 24).

letter to Plaintiff dated January 12, 2016, the Division of Affirmative Action notified Plaintiff

that upon investigation, it had concluded that Ridler "violated the DOS Affirmative Action

Policy Statement, and therefore, the allegations were substantiated." (*Id.*). The Division further

informed Plaintiff that "administrative action has been recommended to address the issues raised

in the complaint" and advised Plaintiff that if he "experience[d] any retaliation for having filed

this complaint, [he] should report such immediately." (*Id.*).

At the time of the Division of Affirmative Action's finding of racial discrimination,

Ridler was an M-4, the highest position in the CRS title series. (Dkt. No. 80-2, at 57). On or

about January 17, 2017, approximately one year after the Division's finding, Ridler was demoted

from M-4 to CRS 4. (Dkt. No. 80-3, at 2; Dkt. No. 80-2, at 66, 70–71). During this time period,

Ridler was "going through . . . an arbitration process." (Dkt. No. 80-2, at 67). "In 2017, Plaintiff

participated in four witness preparation sessions with DOS counsel's office in anticipation of

testifying at the employment arbitration for Ridler, the last session occurring on May 5, 2017."

(Dkt. No. 80-9, ¶ 6). Plaintiff testified that he was to be a "key witness" at the arbitration. (Dkt.

No. 80-2, at 67–68). However, on or about May 9, 2017, before the arbitration could take place,

Ridler withdrew his objections and retired voluntarily. (Dkt. No. 80-3, at 3; Dkt. No. 80-2, at 69).

On February 2, 2017, Plaintiff filed a "retaliation complaint form" with the Division of

Affirmative Action naming Deputy Secretary Allen. (Dkt. No. 80-2, at 88).

### C.     Loss of Upper Management at OPDCI

Plaintiff testified that in the spring of 2017, OPDCI "lost all of [its] upper management,"

(Dkt. No. 80-2, at 44), including Deputy Secretary Allen, OPDCI Office Director Jennifer

Congdon (M-3), Ridler (CRS 4), and Program Assistant Manager Ken Smith (CRS 3). (Dkt. No.

80-2, at 70–71, 74–75, 77–79, 90–91 (Plaintiff testifying that Smith retired or about March 15,

2017, Congdon left the DOS for another position on or about April 27, 2017, Ridler retired on or

about May 9, 2017, and that Deputy Secretary Allen announced her resignation on July 6, 2017)).

On March 20, 2017, Sarah Crowell,[3] an "RS 2" in the "revitalization specialist title series," was promoted to OPDCI Acting Director, an M-4 position. (Dkt. No. 80-2, at 76–77, 154). Plaintiff testified that due to the departure of the above-referenced "upper management," the CRS 2s in OPDCI, including Plaintiff, "didn't have anyone to supervise [them] for over a year." (*Id.* at 47). According to Plaintiff, from the spring of 2017 through May 15, 2018, "[t]he only management going on" in OPDCI was by CRS 2s, who were managing "the whole unit as a group," doing "all the decision making," and "basically" "running the unit." (*Id.* at 45).

### D. Efforts to Obtain Promotion and Further Complaints of Discrimination and Retaliation

#### 1. Open M-3, CRS 4, CRS 3, and Director of OPDCI Positions

In June 2017, Plaintiff initiated an email exchange with Secretary of State Rosanna Rosado that led to a June 20, 2017, meeting between Plaintiff and Secretary Rosado's "executive office people"—Jim Leary and Brandon Fitzgerald. (Dkt. No. 22-1, at 4; Dkt. No. 80-2, at 81–83). Plaintiff testified that he wanted to speak with Leary and Fitzgerald "about the state of our office not having leadership," as the M-3, CRS4, and CRS3 positions were all vacant. (Dkt. No. 80-2, at 84). Plaintiff also "wanted to go over with them [his] qualifications and . . . potential ability to take one of these leadership positions because [he] head been there working for so long and really know the programs in and out." (*Id.*). Plaintiff "brought [his] resume" and they had "a really good discussion," the conclusion of which was that "they would follow up." (*Id.*).

---

[3] In Plaintiff's deposition, Sarah Crowell is referred to as "Sarah Kroll." (*See*, *e.g.*, Dkt. No. 80-2, at 154).

On June 21, 2017, Plaintiff sent Leary and Fitzgerald an email, with an attached memorandum, thanking them for the meeting and stating that he was available for further discussion and looked "forward to hearing . . . how [they felt Plaintiff] might best be of service in OPD[CI] for the Secretary and Department." (Dkt. No. 22-1, at 6; Dkt. No. 80-2, at 85). In the memorandum, Plaintiff: addressed the "traumatic changes" in OPDCI, "including recent past redirection of mission, three name changes, and numerous staff retirements and other changes"; noted his sixteen years of experience working in OPDCI and his professional achievements; represented that "[i]f deputized, [he] could step in to direct OPD[CI] reorganization while working closely with Executive"; and stated that he would "bring diversity and inclusiveness" and that his placement in "[t]he highest ranked management position would give [him] access to influence, including me in decision to select the next generation of staff." (Dkt. No. 22-1, at 7). Plaintiff stated that he "was interested in being considered for OPD[CI] Director" but would also be interested in "directing the Planning Bureau." (*Id.* at 7–9). In a response, copied to Leary and Secretary Rosado, Fitzgerald wrote: "Thank you, Jamie." (*Id.* at 6).

### 2. Meeting with Division of Affirmative Action and Filing of EEOC Charge

At a July 3, 2017, follow-up meeting with the Division of Affirmative Action, Plaintiff reported that he felt "there was still this ongoing discrimination and harassment and stuff through the office." (Dkt. No. 80-2, at 85–86). Plaintiff testified that because he was "not satisfied with the outcome," he told the Division that he was "taking this outside of DOS and going to the Feds and filing with the EEOC." (*Id.* at 89).

On July 31, 2017, Plaintiff filed charges with the EEOC; the charges were "cross-filed" with the New York State Division of Human Rights. (*Id.*). On September 20, 2017, the EEOC issued a "Dismissal and Notice of Rights." (Dkt. No. 80-3, at 3).

6

3.      **Filling of Deputy Secretary of State and Director of OPDCI Positions**

At a July 6, 2017, a staff meeting, Deputy Secretary of State Sandi Allen announced her resignation.[4] (Dkt. No. 80-2, at 91). Plaintiff testified that following Allen's resignation, he had "suggested" and "tried to demonstrate" to Leary and Fitzgerald that he "was qualified to be the Deputy Secretary of State and run the office," but they had replied that the "decision [was] not entirely up to [them] because the governor's office makes that appointment." (*Id.* at 105).

In August 2017, the governor appointed Kisha Santiago-Martinez, "a staff person in the governor's office," to the Deputy Secretary of State position. (Dkt. No. 80-9, ¶ 9; Dkt. No. 80-2, at 105). In August 2017, Crowell was promoted from Acting Director to Director of OPDCI, (Dkt. No. 80-2, at 45–46). After Santiago-Martinez's appointment to Deputy Secretary of State in August 2017, she "was made aware . . . that Plaintiff had previously made a complaint of racial discrimination against a former supervisor." (Dkt. No. 80-4, ¶ 6). Crowell states in her declaration that "sometime prior to 2018," Plaintiff advised her that he "had made a complaint of racial discrimination against his prior supervisor." (Dkt. No. 80-6, ¶ 5).

On September 18, 2017, Plaintiff emailed Leary and Fitzgerald requesting a follow-up discussion. (Dkt. No. 80-2, at 103). On September 29, 2017, Leary responded, thanked Plaintiff for his email, stated "[w]e are very happy to have a new leadership structure in place within OPD," and advised Plaintiff that "the most appropriate thing for you to do at this point is discuss opportunities within OPD[CI] with Kisha [Santiago-Martinez]." (Dkt. No. 22-1, at 11).

E.      **Plaintiff's Meeting with Deputy Secretary Santiago-Martinez**

On or about November 7, 2017, Plaintiff contacted Deputy Secretary Santiago-Martinez via email to schedule a meeting. (Dkt. No. 84, at 29). Santiago-Martinez replied the same day

---

[4] Plaintiff testified that Allen "looked upset." (Dkt. No. 80-2, at 95). Plaintiff testified that one person in the meeting raised his hand and asked: "[a]re we talking about the fact that Steve Riddler has left?" (*Id.* at 98).

requesting "more details so I can balance out the priorities," and explaining that she was "still learning the lay of the land" and hoped to check in "with staff . . . very soon but there" were "a lot of fires burning." (*Id.* at 28). On November 8, 2017, Santiago-Martinez sent Plaintiff a second email, clarifying that she was "definitely open to meeting with [him] but need[ed] more information." (*Id.*). Santiago-Martinez noted that Plaintiff seemed to be "looking to do more here" and appeared to "enjoy[]" being a supervisor and suggested that Plaintiff draft "a proposal on what [he was] interested in doing." (*Id.*). Plaintiff responded that he was "following [Fitzgerald's] direction . . . to discuss the development of divisions and potential opportunities within OPDCI," that "[s]ome aspects of the landscape here have changed since mid-June" when he had "first approached" Secretary Rosado, Fitzgerald, and Leary, and that he wanted speak with Santiago-Martinez "to get a basic feel for the current thinking" before developing a written proposal. (*Id.* at 27–28). Plaintiff also stated that he "was promoted to the lowest level of management . . . —fast approaching five years ago," and that he "would . . . like to make an opportunity to introduce myself and go over my qualifications and experience and what I can bring to the table to help in a higher capacity." (*Id.*).

On December 12, 2017, Plaintiff met with Santiago-Martinez.[5] (Dkt. No. 80-9, ¶ 10). At that time, the CRS 3, CRS 4, M-3, and M-4 positions were still vacant. (Dkt. No. 80-2, at 106). Plaintiff testified that when, at the start of the meeting, he told Santiago-Martinez that he was her "senior planner," Santiago-Martinez "barrag[ed]" him with questions, in "a hostile tone of voice," asking: "what do you mean by that? What do you mean by that?" (*Id.* at 107–08). Plaintiff stated that "every time [he] said something," Santiago-Martinez "would be like what do

---

[5] Santiago-Martinez states in her declaration that this meeting was on December 17, 2017. (Dkt. No. 80-4, ¶ 8). That dispute is immaterial to the resolution of the present motions.

you mean by that?" (*Id.* at 107). Plaintiff did not have a chance to discuss his resume,

qualifications, experience, and how he could be of service because all Deputy Secretary "kept

saying" was "[w]hat do you mean by that?" in a "hostile tone of voice." (*Id.* at 107–08). The

meeting "devolved" and ended. (*Id.* at 109).

In her declaration, Santiago-Martinez recalls the December 2017 meeting with Plaintiff

somewhat differently. (Dkt. No. 80-4, ¶ 8). She denies their meeting was "hostile" and states that

she "welcomed the opportunity to discuss the OPDCI programs Plaintiff was involved in,

including the LWRP." (*Id.*). According to Santiago-Martinez, "[i]nstead of discussing OPDCI or

the LWRP":

> Plaintiff stated that he had wanted the position of Director of
> OPDCI; that that the vacancies in the leadership positions of OPDCI
> at the time were the result of his actions in seeking redress for
> discrimination by the prior leadership who separated from State
> service prior to my appointment; and that he was being "looked
> over" for positions within the agency.

(*Id.*). Santiago-Martinez states that after listening to Plaintiff she became "unsure as to the

purpose of the meeting and asked him questions to clarify." (*Id.*). Santiago-Martinez

acknowledges that she "was firm in [her] manner" but states that "at no time was [she]

'antagonistic,' 'aggressive' or harassing toward Plaintiff." (*Id.*).

### F.   Interactions with Santiago-Martinez and Crowell

Plaintiff claims that in January 2018, Santiago-Martinez chastised him and in May 2018,

Crowell had an email he had sent to a number of people in the office, placed in his personnel

folder. (Dkt. No. 84, at 10–12).

### 1.    "Chastisement" by Santiago-Martinez

According to Plaintiff, a January 31, 2018, "Wiki Wiki What" meeting,[6] Plaintiff stated

that OPDCI had "dropped the ball in the Great Lakes region." (Dkt. No. 84, at 11, 33, 36–37).

Plaintiff alleges in the Amended Complaint that Santiago-Martinez "chastised" him for this

statement. (Dkt. No. 22, at 13). The next day, February 1, Santiago-Martinez sent Plaintiff an

email in which she wrote: "I'm not sure if it's accurate to say NY does not have any participation

or action. I believe you made the generic statement yesterday"—that we are not doing anything

in the Great Lakes. We certainly do have a role in the Great Lakes on different fronts."[7] (Dkt.

No. 84, at 36–37). In her declaration, Santiago-Martinez states "that [she] has never 'chastised' a

staff member for speaking up at a 'Wiki wiki what' meeting, since the purpose of the meeting is

to encourage open dialogue amongst participants" and "[t]hese meetings always have multiple

staff members present." (Dkt. No. 80-4, ¶ 12).

### 2.    Placement of Email in Plaintiff's Personnel Folder

On May 2, 2018, Stephanie Wojtowicz, a fellow CRS 2 employee, sent an email to

Plaintiff, James Ethier, and Crowell regarding a future LWRP meeting and requesting input on

"agenda items" and ideas "of how to make these [meetings] more engaging and not just about

contract stuff (which we need to do-but is so boring and tedious)." (Dkt. No. 80-7, at 4). In his

reply the same day, Plaintiff outlined a number of topics for discussion, suggested that a meeting

is "a chance to talk together and set aside contract management details," and stated "Laurissa

need not attend." (*Id.* at 3). On May 3, Plaintiff forwarded his reply to "the full LWRP and

---

[6] Santiago-Martinez instituted "Wiki Wiki What" staff meetings as "informal brain-storming session[s] . . . to encourage all staff to provide feedback and suggestions for improving the effectiveness of the OPDCI." (Dkt. No. 80-4, ¶ 12).

[7] The email was addressed to Plaintiff and sent to Plaintiff as well as a number of other DOS employees. (Dkt. No. 84, at 36–37).

contracts unit"—approximately eighteen individuals, referring the recipients to "the points [he] raised yesterday in an e-mail as an agenda," and inviting further ideas. (*Id.* at 2–3). Plaintiff also forwarded to the group, Wojtowicz's initial email referring to "boring and tedious" "contract stuff." (*Id.*). On May 6, Crowell sent Plaintiff the following email:

> I have been catching up on emails over the weekend, and was concerned when I saw the distribution list on this one. While there are some good suggestions and ideas included in your email, the email chain should not have been forwarded to the full LWRP and contracts units. Please consider your audience when sending emails in the future.

> I was most concerned that you chose to forward to Laurissa and her staff an email in which you stated that Laurissa need not attend the next unit meeting, and in which contracts are referred to as "boring and tedious" and as "clutter," both in your email and in Stephanie's, which was the first in the chain and was meant to be read just by you, Jaime E, and me. I am sure Stephanie did not want Laurissa to receive an email in which she referred to contract issues as tedious. While you may not think your or Stephanie's comments could or should be misconstrued as being negative or unappreciative of the hard work the contract unit does, we are trying to foster a culture of teamwork and mutual respect in the office plus there are three new team members in the unit that may not know how to accept those statements.

> In addition, the suggestions in your email were directed to your fellow supervisors and to me, and certainly warrant further discussion within the LWRP management team, but because that discussion had not yet happened the specific recommendations should not have been extended to a broader audience. Stephanie's response about generally applying structure and discussing further in person during the next meeting should have served as closure for the email chain. While it is of course appropriate to share your ideas with your fellow managers and your supervisor, it is not appropriate to go on to distribute these to the entire unit before there has been discussion with the original group, and before I have had a chance to consider and sign off.

> I'm available on Monday if you would like to discuss this further or have any questions.

(*Id.* at 2). On May 7, 2019, Crowell forwarded the email chain to the assistant to the Deputy Secretary of State, "[f]or Jaime's personnel file please." (*Id.*).

### G.   CRS 3 Promotional Opportunity

"On May 15, 2018, an internal OPDCI posting for interviews for the vacant CRS 3 position was circulated." (Dkt. No. 80-9, ¶ 20; Dkt. No. 80-2, at 116). Plaintiff was one of four candidates who were in a CRS 2 position and appropriately scored on the relevant Civil Service examination; the other candidates were Stephanie Wojtowicz, Jaime Ethier, and Rebecca Newell, all CRS 2s. (Dkt. No. 80-9, ¶ 21). On the civil service exam, Plaintiff was ranked "one,"[8] and his score was "[e]ighty-five." (Dkt. No. 80-2, at 117). Based on his experience, Plaintiff believed he was the most qualified for the position. (*Id.* at 120).

Prior to the June 21, 2018, interviews, "the DOS Human Resources department provided the interviewers"— Santiago-Martinez, Crowell, and Natasha Phillip, a DOS associate attorney—"with the resumes and letters of intent for each of the candidates, along with instructions for the interviews," and a "Candidate Interview Rating Form" with ten questions. (Dkt. No. 80-9, ¶ 23; Dkt. No. 80-5, at 27–28; *see also* Dkt. No. 80-6, ¶ 14 ("In evaluating the candidates, the interviewers were limited to assessing the responses to each of the identical questions posed to the candidates.")). Six of the ten questions required the interviewer to rate the candidate's response on a scale of "1–5," with 5 being the highest rating. (Dkt. No. 80-5, at 13–14). The forms contained space for the interviewer's comments on the candidate's answers to each question. (*Id.*).

---

[8] Plaintiff explained that he would "have to look at the . . . score results" for more information as "there could be three or four people ranked one." (Dkt. No. 80-2, at 117–18).

At the June 21, 2018, interviews, "[e]ach candidate was given the same allotted time and questions"; "[c]larifying questions were permitted but no follow-up questions were allowed." (Dkt. No. 80-4, ¶ 17). "In evaluating the candidates, the interviewers were limited to assessing the responses to each of the identical questions posed to the candidates." (*Id.* ¶ 17). All three interviewers took contemporaneous notes on the Rating Forms. (*Id.*; Dkt. No. 80-6, ¶ 80-6, ¶ 17; Dkt. No. 80-8, ¶ 9; *see also* Dkt. No. 80-5).

Plaintiff gave a copy of his resume and cover letter to each of the interviewers at the interview. (Dkt. No. 80-2, at 127). Plaintiff testified that he believed "the interview went pretty well." (*Id.*). However, the interviewers felt differently. Santiago-Martinez stated in her declaration that "Plaintiff performed below average during his interview," "was not as prepared as the other candidates and did not respond directly to the questions posed." (Dkt. No. 80-4, ¶ 18). Santiago-Martinez stated that "[b]ased on his overall score, [she] ranked Plaintiff last among the four candidates for the position." (*Id.* ¶ 19). Crowell stated that "Plaintiff did not interview well." (Dkt. No. 80-6, ¶ 15). Crowell stated that, "[f]or example, when asked to provide 'two or more situations when you took initiative to either help advance the program or support your colleagues,' Plaintiff only described one such situation while the other candidates all provided two." (*Id.*; *see also* Dkt. No. 80-8, ¶ 10 (Phillip recalling Plaintiff's response to the same question as deficient)). Crowell also cited Plaintiff's own admission during the interview that "he has 'not been good at filling out project tracking spreadsheet [sic] that was assigned but he would use it if he received the promotion.'" (Dkt. No. 80-6, ¶ 15). Crowell "ranked Plaintiff last among the four candidates for the position." (*Id.* ¶ 16). Phillip stated that "[b]ased on [her] recollection and review of the interview score cards Plaintiff did not perform well during his interviews." (Dkt. No. 80-8, ¶ 10). Phillip recalled that Plaintiff "was not as prepared as well as the other

candidates and seemed nervous," (*id.*), and stated that she "ranked Plaintiff last among the four candidates for the position," (*id.* ¶ 11).

Following the interviews, Santiago-Martinez, Crowell, and Phillip "tallied [their] scores, and determined that Stephanie Wojtowicz received the highest average score":

| Name | Kisha | Sarah | Natasha | Total |
|------|-------|-------|---------|-------|
| Stephanie Wojtowicz | 25.5 | 24.5 | 23 | 73 |
| Jaime Ethier | 22 | 20.5 | 25.5 | 68 |
| Rebecca Newell | 20 | 21 | 24 | 65 |
| Jaime Reppert | 16 | 17 | 22.5 | 55.5 |

(Dkt. No. 80-5, at 4). The interviewers finalized the Rating Forms following the interviews, and Santiago-Martinez sent a "the Hiring Recommendation memorandum" recommending that Wojtowicz be promoted. (Dkt. No. 80-4, ¶ 20; Dkt. No. 80-5, at 4–10).

The hiring memorandum indicates that the interviewers asked questions that "were written to assess the demonstrated abilities of the candidates to supervise, which includes overseeing the analysis, evaluation, and processing of work, their abilities to successfully coordinate activities, as well as their ability to represent OPDCI and the diversity of activities and benefits it provides to NY communities." (Dkt. No. 80-5, at 4–5). In outlining the reasons for recommending Wojtowicz fill the CRS 3 vacancy, Santiago-Martinez stated that "[w]hile each candidate demonstrated strengths, [Wojtowicz] received the highest average score and the scoring details how she presented an above average ability to perform the many responsibilities of the CRS 3 in ways that may advance the program and performance of staff." (*Id.* at 5). Santiago-Martinez explained that Wojtowicz demonstrated the ability to lead a strong and diverse team, while maintaining the "ability to be inclusive and definitive" in "her discussion of leadership style during the interview, when she described her ability to take in and evaluate ideas from her team along with her understanding of the importance of making independent decisions

with confidence and clarity." (*Id.*). Santiago-Martinez noted that the final interview question

"was written to help us understand how the candidates described the office to the members of the

public and other agencies," and contrasted Wojtowicz's response with the responses of the other

candidates:

> While the other applicants described the different units of the Office,
> [Wojtowicz's] response went to the core purpose of the Office when
> she said, "We are here to provide assistance to natural, social, and
> economic resources . . . and ability for municipalities to grow
> in a way that's right for them to grow. We don't tell them what to
> do. They tell us and we help them to achieve that" [and described]
> how each program does that.

(*Id.*). Santiago-Martinez explained that Wojtowicz's response demonstrated that she possessed "a

broader perspective of the Office and her ability to serve as an ambassador for the office" as well

as an understanding "of how the individual programs support one another and better support NY

communities and the diversity of its needs when making CRS 3 appropriate decisions." (*Id.* at 6).

The hiring memorandum also contained summaries of the interviews with the three other

candidates. (*Id.* at 7–10). In the memorandum, Santiago-Martinez positively recounted Plaintiff's

responses to questions regarding leadership and initiative, (*id.* at 9 (noting that Plaintiff stated

that he "has a respectful approach to bring out the best in people, instilling confidence in the

mission and meaningful direction" and "discussed his interest and research on drought as an area

that should be incorporated into the office approach to resiliency planning")), but noted that

when asked a follow-up question as to his "plan is for advancing drought he initially stated he

had no plan but later stated he would work with . . . the Resiliency Unit," (*id.*). Santiago-

Martinez also noted the deficiencies she observed in Plaintiff's other responses, noting, for

instance, that "he did not present a clear approach to diffusing challenging situations where time

is not the central issue" and that he would make the "workflow tracking system we currently

use" "better but did not provide details." (*Id.* at 9–10). Santiago-Martinez concluded:

> While Jaime's responses during the interview were thoughtful he
> did not answer all questions directly or in a clear manner. Jaime's
> description of his supportive supervision approach is useful as part
> of the overall team in the office however he did not demonstrate an
> above average the ability to perform the supervisory and
> organizational management responsibilities of a CRS 3 in their
> oversight of coordinating activities between units, and State and
> local agencies, ideas as to how he would strengthen the OPDCI
> programs, and ways to advance the program and performance of
> other staff.

(*Id.* at 10).

Plaintiff testified that he believed Wojtowicz, who had "at least five years less service"

than Plaintiff, was not qualified for the CRS 3 position, because, unlike Plaintiff, she was not a

"professional planner" and "had never" "worked on any LWRP," "done a review or applied

coastal policy in a regulatory function," "done performance measure reporting," or "worked with

the annual report for . . . the coastal management program." (Dkt. No. 80-2, at 134–35). Plaintiff

states, however, that he believes Santiago-Martinez and Crowell "positioned" Wojtowicz "for

her promotion" by allowing Wojtowicz to "conduct a staff meeting on May 24, 2018 without the

presence of Plaintiff and the other CRS 2," and "having staff report to Ms. Wojtowicz on

assignments made during the meeting, and creating a 'One Note Notebook' that was sent to

'LWRP staff to collect their ideas.'" (Dkt. No. 84, at 16 (quoting Dkt. No. 22, at 16–17)).

According to Plaintiff, the announcement of Wojtowicz's promotion deviated from

normal procedure. (Dkt. No. 80-2, at 140). Plaintiff testified that when "someone is promoted,

there is just an email message that says join me in congratulating so and so as now doing this and

that." (Dkt. No. 80-2, at 140). By contrast, Santiago-Martinez announced Wojtowicz's

promotion at a an "impromptu" staff meeting on August 14, 2018. (*Id.* at 141; Dkt. No. 80-4, ¶

20). Immediately prior to the meeting, Crowell pulled Plaintiff into her office and said: "I just want to tell you right now . . . just so you hear it in person that you didn't get selected." (Dkt. No. 80-2, at 142).

## III.   STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable

to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

Where the plaintiff proceeds pro se, the Court must read his submissions liberally and interpret them "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). However, a pro se party's "'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Jordan v. New York*, 773 F. Supp. 2d 255, 268 (N.D.N.Y. 2010) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)); *see also Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011).

## IV.   REQUEST FOR DISCOVERY

Following Defendant's summary judgment motion, Plaintiff filed a letter "request for a reopening of discovery to allow for inclusion of records in topic areas raised by the Defendant's Motion for Summary Judgment and Response to Plaintiff's Reply." (Dkt. No. 90, at 2). Defendant opposes Plaintiff's request. (Dkt. No. 91).

Plaintiff seeks:

- Resumes and cover letters for the CRS 3 position from Stephanie Wojtowicz, Jaime Ethier, Rebecca Newell, and Jaime Reppert that were allegedly provided to the interviewers.

- 2018 work experience, training, and qualifications for Sarah Crowell.

- 2018 work experience, training, and qualifications for Kisha Santiago.

- Investigation reports by Maria Herman regarding Plaintiff's discrimination and retaliation complaints.

- Interview notes between Sarah Crowell and Maria Herman regarding Plaintiff's discrimination and retaliation complaints.

(Dkt. No. 90, at 3). Plaintiff states "[t]hese documents are necessary for a fulsome telling of circumstances, to evaluate the allegation that two of the reviewers appear to be conflicted, and to determine if the declarations filed in the dispositive motion are supported by documentation." (*Id.* at 3). Plaintiff explains that "[t]here are new statements of alleged facts in dispute of which [he] was not aware . . . as they were not central to the case prior to the end of Discovery in March 2023." (*Id.*). Plaintiff asserts that "[t]hese documents may contain . . . information regarding whether Ms. Allen asked Ms. Crowell to fabricate negative reports about Plaintiff's work performance and how Ms. Crowell reacted to that request." (*Id.*). Plaintiff further asserts that "[t]he good cause to reopen Discovery is that new issues central to Defendant's motion to dismiss are raised and it has become clearer that more information is needed given the nature of the motion." (*Id.* at 2).

A party resisting summary judgment on the basis that it needs discovery must submit an affidavit showing: "(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those

efforts." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003) (internal quotations and citation omitted). It is well established that "the trial court may properly deny further discovery" under Rule 56(d) "if the nonmoving party has had a fully adequate opportunity for discovery." *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989) (internal citations omitted). Relatedly, a discovery schedule set by the court can only be modified for good cause, which "depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000).

Plaintiff's request fails on several grounds. First, Plaintiff failed to support his request with a declaration or affidavit, relying instead on his letter. *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994) (explaining that "reference to . . . the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for" the affidavit or declaration required by Rule 56(d) and that "the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate"). Second, Plaintiff has shown only a speculative connection between the evidence he seeks and the retaliation claim at issue in this case. Plaintiff argues that such evidence will demonstrate factual disputes but he does not meaningfully explain *how.* His conclusory assertions are simply not enough to warrant additional discovery. Plaintiff's request may be denied for this reason alone. *See L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 117 (2d Cir. 2020) (finding that request for discovery was "too speculative to justify further discovery"). Third, Plaintiff does not describe any effort to obtain the discovery he now requests. Accordingly, to the extent Plaintiff relies on Rule 56(d) in seeking additional discovery to oppose Defendant's motion for summary judgment, the Court denies Plaintiff's motion.

But even if such evidence could reasonably be expected to create a genuine issue of material fact to defeat summary judgment, the Court finds that Plaintiff has not shown that he was diligent in seeking the evidence such that there is good cause for re-opening discovery. Plaintiff must establish "good cause" for reopening discovery, "which should not be extended when there was ample opportunity to pursue the evidence during discovery." *Leong v. 127 Glen Head Inc.*, No. 13-cv-5528, 2016 WL 845325, at *3, 2016 U.S. Dist. LEXIS 26666, at *9–10 (E.D.N.Y. Mar. 2, 2016) (quotation marks omitted). The initial pretrial scheduling order set an April 15, 2022, discovery deadline. (Dkt. No. 44). On August 4, 2022, the discovery deadline was reset to November 4, 2022. (Dkt. No. 64). On November 4, 2022, the discovery deadline was extended, at Defendant's request, to December 6, 2022. (Dkt. No. 66). On December 12, 2022, the discovery deadline was against extended at Defendant's request to January 6, 2023. (Dkt. No. 70). In a letter dated February 22, 2023, Plaintiff requested permission "to provide a revised interrogatory and discovery documents demand for this case." (Dkt. No. 76, at 1). Following a discovery conference, United States Magistrate Judge Hummel directed Plaintiff "to serve his requests for documents by 3/20/2023," and "respond to Defendants [sic] additional interrogatories by 3/20/2023." (Text Minute Entry, Mar. 7, 2023; Dkt. No. 79).

Discovery closed in this case on March 20, 2023. (Dkt. No. 79). The first time Plaintiff notified the Court that he wished to reopen discovery was on July 7, 2023, (Dkt. No. 88), more than three months after the close of discovery, and nearly two months after Defendant filed its motion for summary judgment. It appears that Plaintiff did not depose Santiago-Martinez or Crowell, or any DOS employees, and there is no indication in the record that Plaintiff lacked the opportunity to do so, or that any he did not have the opportunity to conduct less than full discovery in this case. While mindful of Plaintiff's pro se status, the Court notes that Plaintiff

21

appears to have engaged actively in discovery, appeared at status and discovery conferences, (*see*
Aug. 4, 2022 Text Minute Entry (status conference); Mar. 7, 2023 Text Minute Entry (discovery
conference)), and filed a motion to compel, (Dkt. No. 58). As Plaintiff appears to have had ample
discovery in this case, and he fails to show good cause for his belated request to reopen
discovery, his request is denied.

## V.    STATEMENTS OF MATERIAL FACT

Before turning to the merits, the Court must address Defendant's contention that many of
Plaintiff's factual allegations are not supported by any admissible evidence and that Plaintiff has
therefore failed to raise a genuine issue of material fact with respect to those allegations. (Dkt.
No. 87, at 5–12). Rule 56(c)(1)(A) requires that a "party asserting that a fact . . . is genuinely
disputed must support the assertion by: (A) citing to particular parts of materials in the record . .
.; or (B) showing that the materials cited do not establish the absence or presence of a genuine
dispute." Under Rule 56(e) if a party "fails to properly address another party's assertion of fact as
required by Rule 56(c), the court may," inter alia, "consider the fact undisputed for purposes of
the motion" or "grant summary judgment if the motion and supporting materials—including the
facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).
Similarly, N.D.N.Y. Local Rule 56.1(b) requires that that each denial in a response to a statement
of material facts "set forth a specific citation to the record where the factual issue arises," and
provides that "[t]he Court may deem admitted any properly supported facts set forth in the
Statement of Material Facts that the opposing party does not specifically controvert."

A court has discretion to deem facts admitted or grant summary judgment in accord with
Rule 56(e)(2), (3), and the court's local rules, but is not required to do so. *T.Y. v. New York City
Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a
Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are

uncontested and admissible."); *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)

("A district court has broad discretion to determine whether to overlook a party's failure to

comply with local court rules."). The Court "may in its discretion opt to 'conduct an assiduous

review of the record' even where one of the parties has failed to file" a Local Rule 56.1

statement. *Id.*; *see also* Advisory Committee Notes to 2010 Amendment to Fed. R. Civ. P. 56

(noting that when a party "fails to properly address another party's assertion of fact as required

by Rule 56(c)," "the court may choose not to consider the fact as undisputed, particularly if the

court knows of record materials that show grounds for genuine dispute," and that "the court may

seek to reassure itself by some examination of the record before granting summary judgment

against a pro se litigant"); Fed. R. Civ. P. 56(c)(3) (noting that the court "may consider other

materials in the record," beyond the cited materials).

      In moving for summary judgment, Defendant expressly notified Plaintiff that:

> pursuant to Federal Rule of Civil Procedure Rule 56(e), when a
> motion for summary judgment is made and properly supported, you
> may not simply rely upon your pleadings to oppose said motion, but
> you must respond by affidavits or as otherwise provided in that rule,
> setting forth specific facts showing that there is a genuine issue of
> material fact for trial. Any factual assertions in Defendant's
> Declarations will be accepted by the Judge as being true unless you
> submit affidavits or other documentary evidence contradicting our
> assertions.

(Dkt. No. 80, at 1–2). In addition, as required by the Local Rule 56.2, Defendant annexed a copy

of the United States District Court, Northern District of New York "Notification of the

Consequences of Failing to Respond to a Summary Judgment Motion" to its motion. (*Id.* at 2–3).

Despite these warnings, as Defendant notes in its reply, Plaintiff has not responded with

evidentiary proof and instead largely relies in statements in his memorandum of law or

references to the Amended Complaint, both of which are unsworn. (Dkt. No. 87, at 5–12 (citing

Dkt. Nos. 84 (Plaintiff's memorandum of law), 22 (Amended Complaint)).[9]

However, "as the Second Circuit has made clear [that] 'special solicitude should be

afforded pro se litigants generally, when confronted with motions for summary judgment," and

because "'the Court retains some discretion to consider the substance of the plaintiff's

arguments, where actually supported by evidentiary submissions,'" *Hamm v. Hatcher*, No. 05-

cv-503, 2013 WL 71770, at *6, 2013 U.S. Dist. LEXIS 2203, at *18–19 (S.D.N.Y. Jan. 7, 2013)

(internal citations omitted) (first quoting *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988);

and then quoting *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009)), the Court

has considered the exhibits to the Amended Complaint, (Dkt. No. 22-1), to the extent Plaintiff

relies on them in his memorandum of law or in his deposition testimony. Nonetheless, as

discussed more thoroughly below, while mindful of Plaintiff's status as a pro se litigant, because

Plaintiff received "adequate notice that he needed to submit affidavits or other admissible

evidence to create a genuine factual dispute on his claims," the Court accepts Defendant's

version of the facts where Plaintiff has not properly supported his factual allegations. *See*

*Salahuddin v. Goord*, 467 F.3d 263, 278 (2d Cir. 2006) (accepting the defendant's "version of

events" where the pro se plaintiff "received adequate notice that he needed to submit affidavits

or other admissible evidence to create a genuine factual dispute on his claims," but pointed "only

to his unsworn complaint to dispute [the defendant's] version of events").

---

[9] The original complaint is signed under penalty of perjury, but even assuming its consideration is proper, it offers few facts. (Dkt. No. 1).

VI.     **RETALIATION – TITLE VII**

Defendant argues that Plaintiff's Title VII retaliation claim is subject to summary judgment because Plaintiff cannot show that it subjected him to retaliatory incidents and failed to promote him in retaliation for protected activity. (Dkt. No. 80-10, at 16–22). In response, Plaintiff contends that he was subject to several acts of retaliation connected to his complaints of discrimination. (Dkt. No. 84, at 17–25).

Title VII states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Title VII retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 73–74 (2d Cir. 2015).

Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation by showing evidence that: (1) he engaged in protected activity, (2) the defendant was aware of the activity; (3) the defendant took an adverse employment action against him; and (4) there is a causal connection between the protected activity and the adverse action. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). If Plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, non-retaliatory reason existed for its action. *Summa*, 708 F.3d at 129. If the employer demonstrates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the employee to show "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

A.      **Prima Facie Case**

1.      **Protected Activity**

There is no dispute that Plaintiff engaged in protected activity (1) when he complained to

the DOS's Division of Affirmative Action in 2016 that Ridler was subjecting him to racial

discrimination and (2) when he assisted DOS counsel's office in April and May 2017 in

preparing for Ridler's arbitration. (Dkt. No. 84, at 20; Dkt. No. 80-10, at 16–17). However, in

view of Plaintiff's pro se status, the Court additionally notes the evidence that on February 2,

2017, Plaintiff filed a complaint of retaliation with the Division against Deputy Secretary of

State Allen, and that Plaintiff filed charges with the EEOC on or about July 31, 2017. (Dkt. No.

80-2, at 88; Dkt. No. 80-3, at 2–3); *see Belton v. Borg & Ide Imaging, P.C.*, 512 F. Supp. 3d 433,

445 (W.D.N.Y. 2021) (finding filing of EEOC charge constituted "'protected activity' for

purposes of . . . pending retaliation claims" (citing *Jaeger v. N. Babylon Union Free Sch. Dist.*,

191 F. Supp. 3d 215, 232 (E.D.N.Y. 2016)).

2.      **Awareness of Protected Activity**

Santiago-Martinez states in her declaration that she "was made aware after [her]

appointment" to Deputy Secretary of State in August 2017, that Plaintiff had previously made a

complaint of racial discrimination against a former supervisor." (Dkt. No. 80-4, ¶ 6). Crowell

states that "Plaintiff advised [her] sometime prior to 2018 that he had made a complaint of racial

discrimination against his prior supervisor." (Dkt. No. 80-6, ¶ 5). Thus, Plaintiff has identified

evidence satisfying the second element.

3.      **Adverse Actions**

Generally, "an adverse employment action is any action that 'could well dissuade a

reasonable worker from making or supporting a charge of discrimination.'" *Vega v. Hempstead

Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co.*

*v. White*, 548 U.S. 53, 57 (2006)). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII: '[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" *Id.* (quoting *Burlington Northern*, 548 U.S. at 64) (alterations in original). The Supreme Court has explained that it has:

> phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."

*Burlington Northern*, 548 U.S. at 69 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998)). To determine "whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks*, 593 F.3d at 165 (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

Plaintiff claims that he suffered a number of adverse actions in retaliation for his reporting of Ridler's racial harassment in January 2016, participation in the process leading to Ridler's eventual departure from the DOS, from January to May 2016, and filing of EEOC charge in July 2017. (Dkt. No. 84, at 19–23). Specifically, Plaintiff claims that: (1) from December 2017 to May 2018, Santiago-Martinez and Crowell subjected him to a number of retaliatory incidents, including hostile and tense meetings, chastisement, the assignment of a demeaning task, and denial of a window cubicle despite Plaintiff's seniority; and (2) that Defendant failed to promote him to CRS 3 in 2018. (*Id.*).

### a.    Alleged Adverse Actions - December 2017 to May 2018

Plaintiff asserts the following incidents, which occurred between December 2017 to May 2018, constitute adverse actions: (1) Santiago-Martinez exhibited hostility toward Plaintiff during their December 12, 2017 meeting, (*see* Dkt. No. 80-2, at 107–08 (Plaintiff testifying that Santiago-Martinez "barrag[ed] [him] with what do you mean by that? What do you mean by that?" in a "hostile tone of voice")); (2) Santiago-Martinez chastised Plaintiff following a January 31, 2018 "Wiki Wiki What" staff meeting, (Dkt. No. 84, at 11); (3) on or about May 7, 2018, Crowell requested that an email chain Plaintiff authored be placed in his personnel file, (*id.* at 22); (4) on May 18, 2018, Santiago-Martinez and Crowell questioned Plaintiff about a project during a team committee meeting, causing a tense situation and placing Plaintiff on the defensive, (*id.* at 10); (5) on May 21, 2018, Santiago-Martinez and Crowell "minimized" Plaintiff's skills by assigning the "demeaning" task of drafting performance evaluation guidelines, (*id.* at 11–12); (6) a window cubicle became available but was not assigned to Plaintiff despite his seniority, (*id.* at 12); and (7) Santiago-Martinez told Plaintiff to "put a pin in it" during a meeting at which Plaintiff had attempted to raise an issue, (*id.* at 22).

Before addressing the merits, the Court addresses Defendant's assertion that Plaintiff has failed to present evidence to show several of the alleged incidents—the allegedly "tense" May 18, 2018 meeting with Santiago-Martinez and Crowell, the allegedly "demeaning" May 21, 2018 assignment to draft performance evaluation guidelines, the "window cubicle," and the meeting during which Santiago-Martinez allegedly told Plaintiff to "put a pin in it," (Dkt. No. 87, at 7–9)—constitute adverse actions.

In his memorandum of law, Plaintiff states that during a meeting on May 18, 2018, Santiago-Martinez and Crowell "subjected [him] to a barrage of questioning that seemed adversarial" and that "another staff member . . . had to 'defuse the tense' situation." (Dkt. No. 84,

at 10 (citing Dkt. No. 22, at 12)). In declarations, Santiago-Martinez states that she does not

"recall Plaintiff's characterization of the May 18, 2018, meeting," (Dkt. No. 80-4, ¶ 11), and

Crowell states that she does "not agree with Plaintiff's characterization" of the meeting and does

"not recall participating in any meeting with Plaintiff that could be described as 'tense' or that

required 'defusing' by a staff member." (Dkt. No. 80-6, ¶ 7). However, both Santiago-Martinez

and Crowell acknowledged that as part of their responsibilities, they "will question staff,

including Plaintiff, at meetings regarding the specifics of our program guidance and other related

documents" in order to "ensure we provide accurate and uniform information in our publication,

not to question the knowledge and expertise of the staff member." (*Id.* ¶ 7 (Crowell); *see also*

Dkt. No. 80-4, ¶ 11 (Santiago-Martinez)). As Plaintiff's factual allegations are contained in his

memorandum of law and Amended Complaint, both of which are unsworn, they fail to raise a

triable issue of fact. Thus, the Court accepts Defendant's version of the events, and finds that

while a fact-finder could conclude there was a meeting on May 18, 2018, and that Plaintiff may

have been questioned during that meeting, there is no evidence from which a factfinder could

conclude that the meeting was tense or required defusal. Accordingly, the Court concludes that

Plaintiff fails to show that this meeting was an adverse action.

        In his memorandum of law, Plaintiff asserts that "at a May 21, 2018 supervisor's

meeting, Ms. Santiago tasked Plaintiff with preparing a performance evaluation guideline for use

by other supervisors"; Plaintiff "took the assignment as an example of being 'singled out with a

non-planning profession task' and a 'subtle way of showing all supervisors that [Plaintiff] is only

fit to assign simple tasks that have no import the direction of the LWRP program.'" (Dkt. No. 84,

at 11–12 (quoting Dkt. No. 22, at 13)). Plaintiff contends that "this was a demeaning task and

was not ever distributed to supervisors." (Dkt. No. 84, at 12). With respect to this assignment,

Santiago-Martinez states that she informed "plaintiff that his performance evaluations were well prepared to a degree [she] did not see in evaluations by other CRS 2s," and "asked Plaintiff to draft a performance evaluation guideline for others to use [sic] an example." (Dkt. No. 80-4, ¶ 13; *see also* Dkt. No. 80-6, ¶ 10 (Crowell)). Santiago-Martinez states this task was "an important management function . . . intended to promote Plaintiff's particular acumen." (Dkt. No. 80-4, ¶ 13; *see also* Dkt. No. 80-6, ¶ 10 (Crowell)). As Plaintiff's memorandum of law is unsworn and Plaintiff cites no evidence in support of his assertion, the Court accepts Defendant's factual assertions regarding the assignment of the performance guidelines task. Specifically, the Court concludes there is no evidence from which a reasonable factfinder could conclude that Santiago-Martinez and Crowell's assignment of the performance guidelines task was inappropriate, meaningless, or demeaning. Accordingly, Plaintiff has failed to present evidence from which a factfinder could conclude that this assignment constituted an adverse action.

Plaintiff asserts in his memorandum of law that "upon the retirement of another CRS 2 (Renee Parsons), Plaintiff was not offered a 'window cubicle,' which is 'recognized as a seat of authority,'" (Dkt. No. 84, at 12 (quoting Dkt. No. 22, at 13)). In her declaration, Crowell states that cubicles are "assigned based on seniority and grade level," that "window cubicles are generally offered to employees with salary grade levels of 25 and above," and that "Plaintiff's salary grade level is 23." (Dkt. No. 80-6, ¶ 9). Plaintiff attempts to dispute Crowell's declaration by asserting that Renee Parsons, the prior occupant of the window cubicle, was a "grade 23," (Dkt. No. 84, at 12 (citing Dkt. No. 22, at 13)), but as Plaintiff's assertion is in his unsworn memorandum of law, and cites, as evidence, Plaintiff's unsworn amended complaint, the Court accepts Defendant's version of the facts with respect to the cubicle. *See Salahuddin*, 467 F.3d at

278. Thus, Plaintiff has failed to adduce any evidence suggesting that the failure to assign him to the window cubicle was an adverse action.

Plaintiff asserts in his memorandum of law that during a staff meeting, "he suggested a topic for discussion to which Ms. Santiago allegedly told him to 'put a pin it.'" (Dkt. No. 84, at 10 (quoting Dkt. No. 22, at 11)). "Plaintiff, referencing the on-line Urban Dictionary, took her comment to mean the 'topic is a live hand grenade for which I should replace the pin to avoid a dangerous detonation.'" (*Id.* (quoting Dkt. No. 22, at 11)). In her declaration, Santiago-Martinez states that she "cannot recall the specific instance Plaintiff is referring to" but that, in general, she uses "this phrase to suggest that topic be tabled for another time." (Dkt. No. 80-4, ¶ 9). Plaintiff disputes Santiago-Martinez's statement that he "misinterpreted her use of the phase 'put a pin in it,'" asserting that Santiago-Martinez's assertion "does not jibe with the" "brusque dismissive" "tone of voice with which the comment was delivered." (Dkt. No. 84, at 10, 22). But as Plaintiff relies on the statement in his unsworn memorandum of law to dispute Santiago-Martinez's assertion that she used the phrase as a managerial tool to "recognize a valid discussion topic that should be considered for a future meeting," (Dkt. No. 80-4, ¶ 9), the Court accepts Defendant's version of events. *Salahuddin*, 467 F.3d at 278. Thus, even assuming this incident, for which Plaintiff provides no date and of which Santiago-Martinez has no recollection, occurred, absent any evidence suggesting that Santiago-Martinez's use of "put a pin in it" was "brusque" or "dismissive," the Court concludes Plaintiff has failed to show Santiago-Martinez's comment was an adverse action.

Turning to Plaintiff's remaining allegations of adverse actions, with the exception of the 2018 failure to promote to CRS 3 discussed below, the incidents alleged by Plaintiff, even if true, do not independently amount to adverse actions. It is well-established that "petty slights or minor

annoyances that often take place at work" do not amount to actionable retaliation. *Burlington Northern*, 548 U.S. at 68. Falling into this category are Plaintiff's allegations that Santiago-Martinez was "hostile" toward him during the December 12, 2017 meeting, (*see* Dkt. No. 80-2, at 1087–08 (Plaintiff testifying that Santiago-Martinez "barrag[ed] [him] with what do you mean by that? What do you mean by that?" in a "hostile tone of voice"), chastised him following a January 31, 2018 "Wiki wiki what" staff meeting, that on or about May 7, 2018, and Crowell's placement of an email thread, in which she advised Plaintiff to obtain supervisor sign-off before sending similar emails in the future, in Plaintiff's personnel file. *See*, *e.g.*, *Wrobel v. Cnty. Of Erie*, 692 F.3d 22, at 31 (2d Cir. 2012) (concluding alleged "interrogation" of the plaintiff, a highway department employee, by the defendant who ran the highway department and "questioning" of the plaintiff "by a county sheriff about a theft" at the highway department were "*de minimis* slights and insults" that did not "amount to retaliation") (First Amendment retaliation).

Here, there is no evidence that there were any repercussions from the December 12, 2017 meeting with Santiago-Martinez, or that Santiago-Martinez's purported chastisement of Plaintiff on February 1, 2017 for a statement Plaintiff made at a "Wiki Wiki What" meeting the day before or Crowell's placement of the email thread in Plaintiff's personnel file, resulted in any disciplinary or other action or impacted his employment or promotional opportunities in any manner. Moreover, the undisputed evidence indicates that Santiago-Martinez's allegedly chastising response consisted of questioning the accuracy of Plaintiff's statement regarding New York participation in Great Lakes efforts to address an invasive species, (Dkt. No. 84, at 36–37), and was thus an employment-based, constructive comment, *see Martinez-Santiago v. Zurich N. Am. Ins. Co.*, No. 07-cv-8676, 2010 WL 184450, at *11, 2010 U.S. Dist. LEXIS 4246, at *37

(S.D.N.Y. Jan. 20, 2010) (finding the plaintiff failed to show adverse action as "reasonable employee would not be dissuaded from filing a discrimination complaint merely because her supervisor gave her constructive employment-based criticism"). Similarly, nothing in the email thread, including Crowell's criticism of Plaintiff's inappropriate forwarding of email to the entire unit without obtaining supervisory approval, or Crowell's forwarding the email to Plaintiff's personnel file suggests it was other than employment-based criticism, that it had any additional adverse consequences, or was outside normal disciplinary procedures. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 26 (2d Cir. 2014) (concluding that "without more," such as a showing of a "departure from . . . normal disciplinary practices," "two disciplinary citations . . . for insubordination over a two-year period," "assignment to drive particularly dirty buses," "one late overtime payment, and . . . one-time refusal to give him a half-day off for a doctor's appointment" " either alone or in conjunction with the other acts" failed to show adverse action); *cf. Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) ("[C]riticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."). Accordingly, the Court concludes that Plaintiff has failed to present evidence that the above incidents were adverse employment actions.

### b.     Failure to Promote

It is undisputed that failure to promote is an adverse employment action. *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) (finding the plaintiff established adverse employment action element of retaliation claim, explaining that the "claim of . . . failure to promote falls within the core activities encompassed by the term 'adverse actions'"). It is further undisputed that Plaintiff applied and was interviewed for the CRS 3 promotion in May and June

2018 and was denied the promotion. Thus, a reasonable factfinder could conclude that Plaintiff suffered an adverse action.

### c.       Aggregate

As discussed above, alleged acts of retaliation must be considered separately, and in the aggregate, with attention paid to their context. *See Burlington Northern*, 548 U.S. at 69; *see also Vega*, 801 F.3d at 92 ("Some of these actions, considered individually, might not amount to much. Taken together, however, they plausibly paint a mosaic of retaliation and an intent to punish Vega for complaining of discrimination."). Here, the Court concludes that the alleged incidents—Plaintiff's December 2017 interactions and meetings with Santiago-Martinez, the February 1, 2018, chastisement by Santiago-Martinez after "Wiki Wiki What" meeting, and Crowell's May 7, 2018, placement of an email chain in his personnel file—are so minor and sporadic, that even when considered together as leading into the alleged failure to promote in May and June 2018, they fail to add up to a retaliatory adverse action that might dissuade a reasonable work from making or supporting a charge of discrimination. *See Tepperwien*, 663 F.3d at 568 (concluding that "no reasonable jury could have found" the "three fact-finding sessions;" "a counseling;" "threat[s] of termination;" "comments and stare during the employee meeting;" falsification "of the reason for bringing [the plaintiff] in on his day off;" and "being forced to switch from a day shift to the night shift," "considered both individually and in the aggregate, were materially adverse" for purposes of retaliation claim).

### 4.       Causal Connection

As for the causal connection required under Title VII, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362. "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory

treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal quotation marks omitted); *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of retaliation 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)); *see El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (recognizing that "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII").

As discussed above, there is evidence that Plaintiff engaged in protected activity from January 2016 through May 2017, when he filed the racial discrimination complaint against his supervisor, Ridler, and assisted the Division of Affirmative Action in the ensuring arbitration, and again in July 2017, when Plaintiff filed the EEOC charge. There is, however, no evidence that Santiago-Martinez, Crowell, or Phillip knew of Plaintiff's protected activity in July 2017. The evidence is only that both Santiago-Martinez and Crowell were aware that Plaintiff had "made a complaint" of racial discrimination against his prior supervisor, and that Crowell was aware that he had made this complaint sometime prior to 2018. (Dkt. No. 80-4, ¶ 6; Dkt. No. 80-6, ¶ 5).[10] While "general corporate knowledge" is sufficient to satisfy the second prong, a

---

[10] Indeed, Plaintiff testified at his deposition he could not prove these individuals were aware of his "complaints":

> Q    Can you demonstrate that when you were being interviewed for this job
> . . . Kisha Santiago, Sarah Kroll, Natasha Phillip . . . they knew that you
> had filed complaints –
>
> A    No.
>
> Q    -- and that would have been a reason why they decided not to hire you
> for the CRS 3 position.

"[p]laintiff cannot rely on general corporate knowledge alone to satisfy the third 'causal

connection' prong." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 34 (E.D.N.Y. 2015) (citing

*Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 n.4 (2d Cir. 2013)).

Even considering Plaintiff's July 2017 complaint with the EEOC and even assuming

Plaintiff's December 12, 2017, Plaintiff's meeting with Santiago-Martinez, the February 1, 2018,

email exchange with Santiago-Martinez, and Crowell's placement of Plaintiff's email in

Plaintiff's personnel file on May 7, 2018 constituted adverse actions, Plaintiff fails to adduce

evidence of causal connection. The time period between Plaintiff's last protected activity on July

31, 2017 (filing of EEOC charge) and: Plaintiff's December 12, 2017 meeting with Santiago-

Martinez, is approximately four months; Santiago-Martinez's February 1, 2017 "chastis[ing]"

email, is approximately six months; and Crowell's placement of Plaintiff's email and her

response in Plaintiff's personnel file, is approximately nine months. "In the absence of any

further evidence suggesting retaliation, months of separation between protected activity and

alleged retaliation cannot be considered very close." *Crosby v. Stew Leonard's Yonkers LLC*, No.

22-cv-4907, 2023 WL 6318524, at *14, 2023 U.S. Dist. LEXIS 174166, at *41 (S.D.N.Y. Sept.

28, 2023) (quoting *Miller v. McHugh*, 814 F. Supp. 2d 299, 321 (S.D.N.Y. 2011) (finding

temporal proximity of five months insufficient to establish a causal connection)). On this record,

the gap between the protected activities and alleged adverse actions are too great to allow an

inference of causal connection.

Regarding the denial of the CRS 3 promotion, without any evidence of discriminatory or

retaliatory comments from which to connect Plaintiff's last protected activity, the filing an

---

A       No.

(Dkt. No. 80-2, at 151).

EEOC complaint on July 31, 2017, to the adverse action, the denial of CRS 3 promotion on or after May 18, 2018, the nine-month time span is too attenuated to allow a reasonable fact-finder to infer a causal connection. *See Summa*, 708 F.3d at 128 (discussing circumstances permitting a finding of temporal proximity at seven months); *see also Figueroa v. Johnson*, 109 F. Supp. 3d 532, 550 (E.D.N.Y. 2015) (finding that the plaintiff failed to raise material issue of fact as to causal connection where the plaintiff "provided no further allegations, much less evidence, to support a finding of a causal connection between" the protected activity and adverse action and concluding that "[g]iven the eight month stretch of time between the two events, their mere occurrence without more from Plaintiff is not enough to support a finding of causal connection in this situation"), *aff'd*, 648 F. App'x 130 (2d Cir. 2016). Thus, Plaintiff has failed to present evidence from which a reasonable factfinder could find a prima facie case of retaliation.

### B.     Legitimate, Non-Retaliatory Reasons

Even assuming Plaintiff could establish a prima facie case of retaliation with respect to his treatment by Santiago-Martinez at their December 12, 2017, meeting, Santiago-Martinez's comments to Plaintiff following the January 31, 2018, "Wiki Wiki What" meeting, Crowell's placement of the email thread in Plaintiff's personnel file, and the denial of the CRS 3 promotion, Defendant asserts that there were valid reasons for all of the retaliatory incidents alleged by Plaintiff. (Dkt. No. 147-2, at 20–23).

Santiago-Martinez avers that at their December 12, 2017 meeting,  "instead" of discussing "the OPDCI programs Plaintiff was involved in, including the LWRP," Plaintiff discussed "the vacancies in the leadership positions of OPDCI," and told Santiago-Martinez that they "were the result of [Plaintiff's] actions in seeking redress for discrimination by the prior leadership who separated from State service," and stated that he had wanted the position of Director of OPDCI and that "he was being 'looked over' for positions within the agency." (Dkt.

No. 80-4, ¶ 8). Santiago-Martinez states that because she "was unsure as to the purpose of the meeting," she and asked Plaintiff's questions "in a firm manner" "to clarify." (*Id.*). Attempting to "clarify" an employee's complaints that he was being "looked over" with respect to promotion, and statements that he was "seeking redress for discrimination by the prior leadership" is a legitimate, nonretaliatory reason for asking questions of an employee.

Santiago-Martinez denies ever chastising any employee for speaking up at a "Wiki Wiki What" meeting, (Dkt. No. 80-4, ¶ 12–13), and the only evidence in the record concerning this exchange indicates that Santiago-Martinez had a legitimate nonretaliatory reason for sending Plaintiff an email correcting his earlier statement, namely, that Plaintiff's statement regarding the OPDCI's participation in coordinated Great Lake's efforts to combat an invasive species was inaccurate.

As to Crowell's decision to place the email thread in Plaintiff's personnel file, Crowell states that her "email was respectful to Plaintiff, but necessary to avoid any future prematurely distributed emails by him." (Dkt. No. 80-6, ¶ 8). Although Crowell does not address placing the email in Plaintiff's personnel file, considering the record as a whole, it is possible to "glean [a] legitimate, non-retaliatory reason" for this action. *Summa*, 708 F.3d at 129. An employee's forwarding a coworker's email containing information not intended for others, and sharing ideas and recommendations "to the entire unit" without first discussing and obtaining a "sign off" by his supervisor, is a legitimate, nonretaliatory reason for placing a record of the email and Crowell's warning to Plaintiff in his personnel file. (Dkt. No. 80-7, at 2).

Finally, Defendant has presented evidence that the reasons for denying Plaintiff the promotion to the CRS 3 position, included his "below average" performance during the interview and his last-place ranking among the four candidates by all three interviewers. (Dkt. No. 80-4, ¶

18–19). Based on this evidence, the Court finds that the Defendant has shown legitimate, non-retaliatory reasons for the adverse actions alleged by Plaintiff.

### C.      But-For Causation

Defendant contends that Plaintiff cannot rebut its "legitimate, non[retaliatory] reasons for its actions." (Dkt. No. 80-10, at 22). In response, Plaintiff argues that a reasonable jury could find that Defendant had retaliatory intent. (Dkt. No. 84, at 24–25). But at this stage, Plaintiff must adduce evidence to show that the desire to retaliate was the *but-for cause* of the challenged action. *See Nassar*, 570 U.S. 360 (explaining that "Title VII claims must be proved according to traditional principles of but-for causation" and thus require "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer"). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan*, 737 F.3d at 847.

Plaintiff asserts that "Crowell participated in the Ridler and [former Deputy Secretary] Allen investigations" and that Santiago-Martinez joined the DOS as Deputy Secretary of State "as a direct result of prior Deputy Secretary Allen's resignation," and that "[d]ue to the magnitude of management losses, these actions provide a reasonable inference" of retaliatory animus (Dkt. No. 84, at 22). Construed liberally, Plaintiff appears to be asserting that because his racial discrimination and retaliation complaints in 2016 and 2017 led to Ridler's departure and Deputy Secretary Allen's resignation and ultimately to Santiago-Martinez and Crowell's promotions, but-for his complaints of discrimination and retaliation, he would not have been subject to any adverse action or the denial of the CRS 3 promotion. (*See* Dkt. No. 84, at 22 ("Due to the magnitude of management losses, these actions provide a reasonable inference.")).

While Santiago-Martinez and Crowell may not have been in the position to subject Plaintiff to allegedly retaliatory actions but-for Plaintiff's complaints of racial discrimination and retaliation, and the shake up among OPDCI upper management, the required showing is more specific: "a plaintiff must show that retaliatory intent was the 'but-for' cause of any wrongful actions." *Ehrbar*, 131 F. Supp. 3d at 36.

Here, Plaintiff presents no evidence from which a reasonable factfinder could conclude Santiago-Martinez and Crowell acted with retaliatory purpose or intent. As discussed, the nine-month gap between Plaintiff's EEOC complaint and the failure to promote, is too great to allow an inference of temporal proximity, and, in any event, it is well-established that temporal proximity on its own is not enough to show but-for causation. *See Zann Kwan*, 737 F.3d at 847 ("Temporal proximity alone is insufficient to defeat summary judgment at [this] stage.").

And Plaintiff has not identified any evidence calling into question the reasons Defendant provided for not promoting him to CRS 3: his below-average performance during the interview and his last-place ranking among the four candidates for the position.[11] (Dkt. No. 80-4, ¶¶ 18–19; Dkt. No. 80-6, ¶¶ 15–16; Dkt. No. 80-8, ¶¶ 10–11). Although Plaintiff believed he was the most qualified for the promotion, and that "the interview went pretty well," (Dkt. 80-2, at 124), he does not present any evidence on which a factfinder could rely in concluding that deficiencies the interviewers identified in Plaintiff's interview performance or last-place ranking, (*see* Dkt. No. 80-6, ¶ 15 (Crowell stating that, "[f]or example, when asked to provide 'two or more situations when you took initiative to either help advance the program or support your

---

[11] Plaintiff argues that "Santiago and Crowell were biased and used skewed subjective scoring to favor Wojtowicz" and that Phillip ranked Wojtowicz "number three" but was "overridden" when Wojtowicz was selected for the position. (Dkt. No. 84, at 24). Plaintiff presents no evidence from which a factfinder could find bias as to Santiago-Martinez or Crowell and even if Wojtowicz was not Phillip's first choice, it is undisputed that Phillip ranked Plaintiff in last place. (Dkt. No. 80-8, ¶ 11).

colleagues,' Plaintiff only described one such situation while the other candidates all provided two."); *see also* Dkt. No. 80-8, ¶ 10 (Phillip recalling Plaintiff's response to the same question as deficient)), were false or a pretext for retaliation. Even crediting the evidence that Plaintiff was the most qualified for the position based on his experience, Plaintiff has not identified any evidence on which a factfinder could rely in concluding that the determinative factors for the promotion decision was anything other than interview performance and ranking. (*See* Dkt. No. 80-5, at 4–10 (Hiring Memorandum outlining scores and summarizing interview performance, stating that Wojtowicz was selected and that she "received the highest average score and the scoring details how she presented an above average ability to perform the many responsibilities of the CRS 3 in ways that may advance the program and performance of staff")); *see Johnson v. Cnty. of Nassau*, 480 F. Supp. 2d 581, 594 (E.D.N.Y. 2007) ("It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory.").

Plaintiff advances two additional arguments in support of his claim that Defendant's reasons for denying him the CRS 3 promotion were false and a pretext for retaliation. First Plaintiff asserts that Santiago-Martinez and Crowell "positioned" Wojtowicz for "her promotion," by allowing Wojtowicz to conduct a staff meeting on May 24, 2018 without Plaintiff or the other CRS 2s, "having staff report to Ms. Wojtowicz on assignments made during the meeting and creating a 'One Note Notebook' that was sent to 'LWRP staff to collect their ideas.'" (Dkt. No. 84, at 16 (quoting Dkt. No. 22, at 16)). Plaintiff, however, cites no evidence in support of these assertions; they are in his unsworn memorandum of law and Amended Complaint. Thus, Plaintiff's first argument is unavailing.

Second, Plaintiff argues that there was a procedural irregularity. Plaintiff testified that, in general, promotions are announced via email, but that in Wojtowicz's case, Santiago-Martinez called an impromptu staff meeting at which she announced Wojtowicz's promotion. (Dkt. No. 80-2, at 140–41). Plaintiff also testified that immediately prior to the meeting, Crowell pulled Plaintiff into her office "and said I just want to tell you right now . . . just so you hear it in person that you didn't get selected." (*Id.* at 142). But even crediting the evidence that Santiago-Martinez and Crowell announced Wojtowicz's promotion at a meeting as opposed to via email, and that Crowell verbally informed Plaintiff that he was not selected, no reasonable factfinder could conclude this minor departure from procedure shows that the desire to retaliate was the but-for cause of the promotion decision.

Accordingly, Defendant is entitled to summary judgment on Plaintiff's Title VII retaliation claim.

**VII.   CONCLUSION**

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion to reopen discovery, (Dkt. No. 90), is **DENIED**; and it is further

**ORDERED** that Defendant's motion for summary judgment, (Dkt. No. 80), is **GRANTED**; and it is further

**ORDERED** that the Amended Complaint (Dkt. No. 22) is **DISMISSED** and the Clerk is directed to close this case.

**IT IS SO ORDERED.**

Dated: <u>March 25, 2024</u>
      Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

42